UNITED STATES of America,
Plaintiff-Appellee,

v.

Steve **ANNORENO** et al., Defendants-
Appellants.

No. 71–1233.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 4, 1972.

Decided May 26, 1972.

Julius Lucius Echeles, Sherman Magidson, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Chicago, Ill., Marshall Tamor Golding, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

After a lengthy jury trial, the defendants were convicted on a single count indictment charging them with conspiring to make extortionate extensions of credit in violation of 18 U.S.C. § 892(a).[1] Sentences ranging from three to 15 years' imprisonment were imposed by the district court and, in three instances, additional $10,000 fines were exacted. This appeal attacks those convictions on the basis of the sufficiency of the evidence, the government's use of improperly obtained wire-tap evidence, and various trial court errors.

The government's proof consisted of testimony by 26 witnesses who testified that they had on one or more occasions borrowed money from the defendants. This testimony was designed to establish that the defendants were joint participants in the business of lending money at usurious rates of interest upon the usually tacit, but frequently openly expressed, understanding that force and violence would be employed against borrowers who defaulted or were tardy in repaying the principal and interest. In addition, the government produced FBI agents who had witnessed certain of the transactions, and through these agents introduced photographs showing various defendants and their victims in front of the pool hall where the repayments were allegedly made. The government's evidence further showed that the loans were generally made upon one of two conditions: one arrangement provided

1. The Extortionate Credit Transactions Act, 18 U.S.C. § 892, provides in pertinent part:

"(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

"(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate. . . .

(1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor.

\* \* \* \* \*

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either

(A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or

(B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

"(c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b) (1) or (b) (2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension."

**1306**

that the borrower would pay each week a specified rate of interest, usually referred to by the participants as "juice," until such time as he repaid the principal in a lump sum; the other involved a "package deal" whereby the borrower would repay a specified sum each week for a specified time, usually ten weeks, until the total was repaid. Under the former arrangement, the interest rates ranged from five to ten percent per week; under the "package deal," the borrower would generally pay between 50 and 100 percent more than he borrowed.[2]

The pattern of loan transactions related by the government's witnesses is strikingly similar. A borrower, having contacted one of the defendants or their associates, would obtain cash loans without the credit investigation or financial statements required in ordinary loan transactions. Collateral was never required and the agreements were always oral in nature. All but four of the borrowers testified that they understood when they procured a loan that they or a member of their family could be hurt if they failed to meet the repayment

schedule. Their understanding of what might happen if they failed to repay the loans was often implied from the circumstances surrounding the transactions, but there was substantial testimony that defendants frequently coupled their loans with express admonitions against default. These took the form of threats: "We'll send the boys out looking for you," or "You're liable to get hurt," or "You could end up in a trunk or something."[3] In two cases, these threats of physical violence were followed by actual violence.

Payments were generally made in the evening at the Family Amusement Center, a pool hall owned by several of the defendants, or at a barber shop which was frequented by the defendants. When payments were made at the barber shop, it was always after business hours; the borrower would find one of the defendants waiting in the dark. It was at these locations that the FBI employed surveillance techniques which allowed agents to photograph borrowers making payments to numerous defendants. As proof of the existence of a joint enterprise and conspiracy, the gov-

---

**2.** The loans ranged in amounts from $100 to $2,500, typical terms being $5 a week "juice" on a $100 loan or $25 a week interest on a $250 loan. Other loans required payments of $30 a week for ten weeks to pay back a $200 loan or $80 a week for ten weeks to pay back a $400 loan.

**3.** While several witnesses testified that they were never expressly intimidated with respect to repayment of the loans, a significant number gave evidence of specific threats by the defendants. For example, government witness Barnes testified that, when he obtained his initial loan from defendant Steve Annoreno, he was told that he would have to pay it off or "we'll send the boys out looking for you." Similarly, government witness Olsen was told by Annoreno to be sure to make his payment every week because "I don't want to have to come looking for you." When Olsen missed two payments, defendants De Riggi and Vito Spillone stood menacingly on either side of him while Annoreno said, "Don't miss another payment and don't ever make

me come looking for you." Annoreno told another witness, "We have ways of collecting." Defendant Spillone warned yet another borrower to stop missing payments or he was "liable to get hurt." Defendant Bucaro was even more explicit, telling one borrower who had missed several payments that he could "end up in a trunk or something" if he continued to be delinquent. That same defendant warned another government witness that he would be beaten up if he did not "get the money up." Similarly, defendant Annoreno threatened one of his borrowers with violence to him or his family if he continued missing payments. Defendant Milstein used a more subtle approach, warning two different borrowers that their names would be "turned in" if they missed payments, and yet another that he "should not be fooling around with these guys, they're nobody to be playing with." Defendant Kobylarz informed one of his borrowers who had fallen in arrears in his juice payments that "there was no way he could continue to protect (him)."

ernment pointed to the fact that repayment could be made to any of the defendants, not just to the defendant who negotiated the loan. Further, although the borrowers were held responsible to the defendant from whom the loan was actually secured, the threats of physical violence for delinquency came from defendants who frequently had not been involved in the original loan.

I

Although the government's proof related to transactions dating back to 1966, the statute under which the defendants were indicted was not enacted until May 29, 1968. Prior to that time, the conduct for which these defendants were indicted was not a federal crime. The defendants objected to the relevancy of testimony concerning transactions prior to the enactment of the statute. The trial court allowed such testimony into evidence to establish the existence of an agreement, but did instruct the jury that, in order to find the defendants guilty, it had to find that the agreement continued to exist subsequent to the enactment of the Extortionate Credit Transactions Act and that some act in furtherance of the agreement occurred thereafter.

Defendants' objection to this evidence is two-fold: First, they contend that such proof is irrelevant since the transactions prior to May 29, 1968, were not illegal; and second, they urge that the admission of such evidence without adequate limiting instructions was highly prejudicial.

As defendants acknowledge in their brief, courts have generally held that evidence of acts done pursuant to an agreement made prior to statutory proscription of such an agreement may be introduced to show the formation of the agreement, its nature and scope, and its continuity beyond the effective date of the statute. Parr v. United States, 255 F.2d 86 (5th Cir.), cert. denied, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958); Christianson v. United States, 226 F.2d 646 (8th Cir. 1955), cert. denied, 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956); Nyquist v. United States, 2 F.2d 504 (6th Cir.), cert. denied, 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810 (1924).

The relevance of the pre-May 29, 1968, transactions is readily apparent. The defendants were obviously engaged in a continuing course of conduct which began several years before the statute took effect and did not change afterward.[4] In extending credit after the operative date of the statute, they necessarily relied upon and used the impressions created in the minds of potential borrowers by actions and utterances which occurred before the enactment of the statute. For example, borrowers who were threatened with physical violence in the event of nonpayment of loans negotiated prior to enactment were certain to understand the extortionate nature of loans procured subsequent to enactment. If pre-enactment transactions could be relied upon by the defendants to communicate the actual terms of post-enactment loans, they would clearly be relevant to the issue on trial. In addition, they are admissible to show knowledge with respect to each defendant's participation in the enterprise's post-enactment activities.

The admission of such evidence, it is true, should be followed by a limiting instruction informing the jury of the purpose for which it can consider the proof. However, we cannot accede to defendants' view that such limiting instructions were ineffective in this case simply because they were not given contemporaneously with the admission of the evidence. An adequate charge was given prior to the jury's retirement and we believe that instruction clearly set

---

4. The pattern established prior to the enactment of section 892 continued unabated up until the indictments were returned. Payments on pre-enactment loans continued to be received and at least ten new loans were made. Indeed, only three of the government's witnesses had concluded their loan payments prior to May, 1968.

forth the limits within which the evidence could be used.[5]

## II

The defendants argue that this court, in reviewing sufficiency of the evidence, should look only at transactions occurring after May, 1968. In light of the analysis in part I, we have rejected their contention and have reviewed all the evidence introduced at trial.

Viewing the evidence in the light most favorable to the government, we find that there is ample evidence to support the conviction of all the defendants except Anthony Reno. With a single exception, the government clearly established the existence of an active conspiracy to make extortionate loans.

The defendants, acknowledging that loans were made and that the interest rates on those loans were excessive, argue that the government failed to prove that the loans were extortionate in nature. This contention is based on the defendants' belief that the "understanding" required by section 891(6) of the statute must be express rather than implicit. They further contend that the "subjective belief" of a borrower that failure to repay the loan would be dealt with violently is insufficient to establish extortion unless that belief has a "factual basis" in the evidence. Applying this theory to the evidence, defendants Kobylarz and Delgallo argue that their convictions cannot be allowed to stand since no government witnesses testified that they were ever expressly threatened by these two defendants. They merely believed that they would be in danger of physical violence if they failed to meet their payment schedules.

We believe that this argument is based on an erroneous premise. The term "understanding" as used in this statute should not, as defendants argue, be interpreted as requiring an agreement. Rather, it should be given its primary meaning of comprehension.[6]

---

5. The trial court instructed the jury to give separate consideration and render separate verdicts with respect to each defendant. In addition, the jury was instructed that to convict the defendants, the government was required to prove beyond a reasonable doubt that there was a conspiracy to make extortionate extensions of credit, that this conspiracy was in existence on May 29, 1968, and that an overt act in furtherance of this conspiracy was committed after that date. Those instructions read:

"To convict any of the defendants of the charge in the indictment the Government must prove beyond a reasonable doubt:

"(1) That a conspiracy existed to make extortionate extensions of credit in violation of Section 892 of Title 18, United States Code;

"(2) That this alleged conspiracy was in existence after May 29, 1968. If you find that the alleged conspiracy was in existence after May 29, 1968, then you may consider as evidence of that alleged conspiracy acts, conversations, and declarations, made before May 29, 1968, which were in furtherance of that alleged conspiracy; and that

"(3) During the existence of the conspiracy, and after May 29, 1968, at least one overt act as set forth in the indictment was committed by one or more members of the conspiracy in furtherance of the objectives of the conspiracy.

"To convict any particular defendant of the conspiracy charged in the indictment, the Government must prove beyond a reasonable doubt that

"(1) A conspiracy existed to make extortionate extensions of credit in violations of Section 892 of Title 18, United States Code;

"(2) This conspiracy was in existence after May 29, 1968;

"(3) The particular defendant was knowingly and willfully a member of this conspiracy and that he was aware of the common purpose and was a willing participant with the intent to advance the purpose of the conspiracy; and that

"(4) During the existence of this conspiracy, and after May 29, 1968, at least one overt act as set forth in the indictment was committed by one or more members of the conspiracy in furtherance of the objectives of the alleged conspiracy."

6. Webster's Third New International Dictionary of the English Language, Unabridged (1961), at 2490, gives, as the

Clearly, Congress could not have intended to punish only those loan sharks foolish enough to make the terms of the loan explicit and to exempt those who convey the nature of the transaction by subtle hints and innuendo. Where the threat of violence exists and is comprehended by the victim, the extortionate nature of the transaction is present and punishable under this statute.

Thus, the inquiry into whether the borrowers had a factual basis for their comprehension of the consequences of default need not be restricted to a search of the record for explicit threats.[7] On the contrary, the inquiry should be whether the record as a whole discloses a reasonable basis upon which the borrowers might have predicated their fear that default or delinquency might result in harm to themselves or their families. Our review of the record compels the conclusion that the nature of these transactions, in which oral, unsecured loans were made at rates of interest often 30 times the commercial rates with provision for nefarious repayment at such places as street corners, taverns, pool halls and closed barber shops, would inform the average borrower in metropolitan Chicago that the loans were extortionate in nature. As this court noted in United States v. Prochaska, 222 F.2d 1, 2 (7th Cir.), cert. denied, 350 U.

S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955), "words or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published."

As to the remaining defendants, all but Reno were clearly shown to have knowingly and actively engaged in this extortion venture. The government's evidence of defendant Reno's involvement in the extortion conspiracy is, however, much less convincing. Indeed, his only connection with the conspiracy was his acceptance of several payments intended for defendant Annoreno. Government witnesses Shearn and Barnes testified that they made loan payments to Reno, who stated that he would see that the money got to Annoreno. Neither witness testified to any act or statement by Reno which would indicate that he had any knowledge of the extortionate nature of the loan.

Proof of knowledge on the part of a participant in an alleged conspiracy is an essential element of the offense. United States v. Turnipseed, 272 F.2d 106 (7th Cir. 1959); Morei v. United States, 127 F.2d 827 (6th Cir. 1942). Without some proof upon which the jury could impute knowledge to defendant Reno, the conviction cannot be allowed to stand. We conclude, therefore, that

primary meaning of the word, "[t]he Act of grasping mentally: comprehension, discernment, interpretation." An alternate meaning of "[a] mutual agreement not formally entered into but in some degree binding on each side" is given as definition number 4c. The Random House Dictionary of the English Language (1966) states the primary meaning of the word to be "mental process of one who comprehends; comprehension; personal interpretation." An alternate meaning of "a mutual agreement, especially of a private, unannounced, or tacit kind" is given as the sixth definition.

7. Contrary to defendants' contention, it is of no significance that express extortionary language was not directed to all the borrowers or that some of the borrowers were first threatened when they became

delinquent in their repayments rather than when they initially obtained their loans. The defendants were charged with conspiring to make credit extensions which were intended to be extortionate, not with the substantive violations. Therefore, the actual understanding of specific borrowers was not an element of the conspiracy with which defendants were charged. The government need only have proved that the defendants planned and intended that those to whom they extended credit would understand the possible harmful consequences of default or delinquency. See Carbo v. United States, 314 F.2d 718, 740–741 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); United States v. Compagna, 146 F.2d 524, 528 (2d Cir. 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945).

the evidence of defendant Reno's involvement in the conspiracy is insufficient to sustain his conviction. As to all other defendants, it is clearly sufficient.

### III

■ The defendants also challenge their convictions on the basis of the district judge's refusal to grant their request for a bill of particulars naming all the persons to whom extortionate loans were allegedly made. This, they acknowledge, is tantamount to a request for a list of prospective government witnesses which is admittedly unavailable to them under existing authority. United States v. Cansler, 419 F.2d 952 (7th Cir. 1969), cert. denied, 397 U.S. 1029, 90 S.Ct. 1278, 25 L.Ed.2d 540 (1970); United States v. Addonizio, 451 F.2d 49 (3d Cir. 1971). But they argue that such information was absolutely essential to the preparation of an adequate defense to the charges against them.

This argument is predicated upon the First Circuit's holding in United States v. Tomasetta, 429 F.2d 978 (1st Cir. 1970). That case, while at first glance apposite to the situation before us, is distinguishable. *Tomasetta* involved an attack upon an indictment for the substantive offense of extortionate loan sharking. There, the First Circuit reversed a conviction because the indictment had failed to provide an adequate description of the act charged.

In the instant case, however, the indictment does not charge the substantive offense but rather a conspiracy to make extortionate extensions of credit. The difference is significant with respect to defendants' argument that the refusal of their request for a bill of particulars prevented them from adequately preparing their defense. They charge that without knowledge of the specific parties to whom they allegedly made loans, they were unable to "explain and demonstrate the lack of substance of the expressed fear of those who borrowed money" or "establish a lack of fear by the borrowers at the times in question." These issues, however relevant to an in-

dictment for the substantive offenses, are not defenses to the conspiracy charge against the defendants. On the contrary, the essence of this indictment was the intent to create an atmosphere of intimidation and fear with respect to the loans made, not the actual accomplishment of that intent in particular instances.

■ While we cannot deny that the production of the information requested might have facilitated the preparation of the defense, we do not believe that this information was so essential to that defense as to warrant the circumvention of the well established rule that the government is not required to disclose the identity of its witnesses. *See* United States v. Addonizio, *supra.* Thus, having failed to discern any prejudice resulting from the denial of defendants' request, we hold that the refusal to order a bill of particulars was not error. United States v. White, 370 F.2d 559 (7th Cir. 1966). As the defendants recognize, this is a matter resting within the discretion of the trial judge. United States v. Rimanich, 422 F.2d 817 (7th Cir. 1970); Hickman v. United States, 406 F.2d 414 (5th Cir.), cert. denied, 394 U.S. 960, 89 S.Ct. 1309, 22 L.Ed.2d 561 (1969). We do not believe the district judge abused that discretion in denying this request.

### IV

Finally, the defendants have raised two distinct questions arising under the Fourth Amendment. First, it is argued that the convictions of defendants Annoreno, De Riggi and Milstein must be reversed because of the government's use of information gained by admittedly unlawful eavesdropping. Second, defendants contend that an illegal search which produced an address book listing names of borrowers contaminated defendant Milstein's conviction.

■ As to the question of electronic surveillance, the district court conducted a five-day *Alderman* hearing into possible taint from this surveillance

and concluded that there had been no use of illegally acquired evidence. At that hearing, the government successfully showed that none of the information obtained by the wiretaps was used either at trial or in furtherance of the investigation of these defendants. As noted in Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), once the defendant is furnished with the intercepted conversations, the burden is on him to come forward with specific evidence demonstrating taint. It is only after such a showing of taint that the ultimate burden falls on the government to prove that there was no taint. United States v. Battaglia, 432 F.2d 1115, 1117 (7th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L. Ed.2d 828 (1971). We have reviewed the evidence adduced at this hearing and are convinced both that the government made full and adequate disclosure of the surveillance and that the products of that surveillance were not used in either the investigation or prosecution of the defendants. As defendants admit, most of the information so obtained was without probative value in this case, and that information which conceivably was of use was demonstrated to have been obtained contemporaneously from other sources. In such situations, the government adequately meets its burden of showing a lack of taint from the illegal activity.

With respect to the second question, defendant Milstein urges that his conviction be reversed because the government obtained the names of three witnesses who testified against him through a search which the defendant believes was made in violation of his Fourth Amendment rights. The search in question occurred when FBI agents, under the authority of a valid search warrant, conducted a search of Milstein's restaurant for stolen property unrelated to this indictment. During the course of that search, the agents discovered an address book which contained records of Milstein's juice loans. Later the same day, in a search of Milstein's

person after his arrest for the possession of stolen property, a second address book containing similar information was found. From these books the government obtained the names of three witnesses who testified against the defendant.

Milstein argues that the first address book was improperly seized since it was discovered after the agents had found the stolen property described in the warrant and was therefore beyond the reach of the warrant. The government, while not conceding the invalidity of the search under the warrant, argues that the first address book was properly seized in a search incident to a lawful arrest.

In determining the validity of this search, this court must apply the rules governing searches incident to lawful arrest which were in effect prior to the Supreme Court's decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), because Chimel has been limited to prospective application. Williams v. United States, 401 U.S. 646, 651, 91 S.Ct. 1148, 28 L. Ed.2d 388 (1971). While this search would present substantially more difficult problems under the rules enunciated in Chimel, the pre-Chimel decisions compel our conclusion that the agents discovered the address book while properly inspecting the premises which were under Milstein's control. United States v. Rabinowitz, 339 U.S. 56, 61, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 151–152, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Similarly, the agents had the right to search Milstein's person even though that search was not conducted contemporaneously with the actual arrest. As the Fifth Circuit noted in United States v. Gonzalez-Perez, 426 F.2d 1283, 1287 (5th Cir. 1970), "A search of an arrestee is still incident to an arrest when it is conducted shortly thereafter at the jail or place of detention rather than at the time and place of arrest." *See also* Ray v. United States, 412 F.2d 1052 (9th Cir. 1969); Rodgers v. United States,

362 F.2d 358 (8th Cir.), cert. denied, 385 U.S. 993, 87 S.Ct. 608, 17 L.Ed.2d 454 (1966); Baskerville v. United States, 227 F.2d 454 (10th Cir. 1955).

Having concluded that the evidence was sufficient to sustain all the convictions except that of defendant Anthony Reno, and that the trial was free of prejudicial error, the conviction of defendant Reno is reversed and the remaining convictions are affirmed.

Affirmed in part, reversed in part.