**UNITED STATES of America, Appellee,**

v.

**James MARTORANO, Appellant.**

No. 76–1372.

United States Court of Appeals,
First Circuit.

Argued Dec. 13, 1976.

Decided March 30, 1977.*

Rehearing Denied Aug. 24, 1977.
See 561 F.2d 406.

---

\* Following the issuance of this opinion to the parties on March 30, 1977, we received a petition for rehearing which led us to amend the opinion in several respects. The amendments are all reflected herein.

The petition for rehearing was granted on the issue whether the new federal rules of evidence effect a partial overruling of *United States v. Glasser,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), but was denied in all other respects.

Joseph S. Oteri, Boston, Mass., with whom Oteri & Weinberg, Boston, Mass., Alan M. Dershowitz, Jeanne Baker, and Rosenberg, Baker & Fine, Cambridge, Mass., were on brief, for appellant.

Dennis A. Winston, Atty., Dept. of Justice, Washington, D. C., with whom James N. Gabriel, U. S. Atty., and Mervyn Hamburg, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

James Martorano appeals from the judgment of conviction which was entered against him on each count of a four count indictment. Counts one and two charged appellant with conspiring to make, and with making, an extortionate extension of credit in violation of 18 U.S.C. § 892(a). Count three charged conspiracy to use extortionate means to collect an extension of credit in violation of § 894(a). Count four charged appellant with one particular act of using extortionate means to collect an extension of credit. Appellant challenges the sufficiency of the evidence to support the convictions on each of the four counts, and he argues that the district court made a number of erroneous evidentiary rulings. We affirm.

The charges in this case stem from a loan appellant allegedly made to one Peter Pallotta. The government's evidence, viewed in the light most favorable to it, reflects the following. Pallotta had been running a

highly unsuccessful nightclub, and, in late August or early September, 1974, he found himself in need of $2000 to pay some pressing debts. Pallotta's brother took him to see appellant, who agreed to make Pallotta a $2000 loan at five percent interest per week. Told by appellant to return to pick up the money, Pallotta came back the next day and met with appellant and one Matera. Appellant gave Pallotta the money and instructed Matera to go to Pallotta's club each Friday at 7:30 to pick up the weekly payments. No papers were signed, and no collateral was given.

During the next four weeks, Pallotta made the interest payments as follows: once he paid appellant at appellant's club; twice Matera came to Pallotta's club and picked up the money, and once Matera and one Pagano together came to Pallotta's club and received the payment. Sometime in October, Pallotta was forced to close his club for renovations for four weeks, and during this period he did not make any payments. The club reopened on October 30. On that night, appellant and co-defendant Halloran, who was acquitted on all the charges, appeared at Pallotta's club. Because he feared the embarrassment of a beating in his own club, Pallotta left. The next day Pallotta received a telephone call from an unnamed source warning that Pallotta should make himself available to appellant that night. That night Halloran allegedly approached Pallotta in the parking lot outside the club and said that appellant had sent him to get the money. When Pallotta protested that he had no money, Halloran pulled a gun, took Pallotta with him inside the club, and removed some $450 from two separate cash boxes.

Three days later, Pallotta went to see appellant, who asked Pallotta what he was going to do. When Pallotta responded that he had to pay, appellant responded: "Don't be late and see me every week and if you're not going to be here, I want a phone call from you."

Sometime shortly thereafter, Pallotta's club was permanently closed. Because he lacked a source of income and feared physical harm at the hands of several loan sharks, including appellant, Pallotta went into hiding and began living in his car. In late November, 1974, Pallotta contacted the FBI. With Pallotta's consent, the FBI recorded a series of telephone conversations of Pallotta with Halloran, Matera, Pagano, and appellant. In their conversation appellant suggested that Pallotta stop by and see him. When Pallotta expressed his fear of being harmed, appellant replied:

"Don't talk like that on the phone.

.    .    .    .    .

You can come any time. What do you think I'm gonna do something 'round my own place? Be kind of stupid wouldn't it? Ah, first chance you get drop by and see me."

The conversations between Pallotta and Pagano generally verified the existence of the loan and revealed that Pagano and Matera had supplied half of the money which had been loaned Pallotta.

At the trial Pallotta testified as to the reputations of each of the various individuals who allegedly were involved in the transaction. Pallotta testified that appellant was a loan shark and was "100 per cent in getting his collections back  .    ..  Nobody missed. If they did, they got hurt." As to Matera and Pagano, Pallotta testified that they had worked together in a loan shark operation for many years and that if any of their borrowers were ever late in repaying a loan, they would hurt the borrower. Pallotta also stated he had known Halloran for a long period of time and that Halloran was "a loan shark, collector and enforcer and a madman" and that he collected for appellant. This reputation testimony was all admitted subject to the limitation that it could be considered only as to Pallotta's state of mind. Finally, Pallotta testified that at the time he accepted the extension of credit he knew he would be physically harmed if he failed to repay on time.

I.  Sufficiency of the Evidence

■ Section 892 proscribes the making of extortionate extensions of credit, which

§ 891(6) defines as "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making the repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." Appellant attacks his conviction under count two on the theory that the record is entirely void of any evidence indicating that he understood that Pallotta's failure to make timely repayments could result in the use of force or violence against Pallotta. The short answer to this argument is § 892(b), which declares that there is prima facie evidence that an extension of credit is extortionate if the following facts exist: (1) repayment is unenforceable through normal judicial processes; (2) the loan's interest rate is in excess of 45 percent per year; (3) the amount of the loan exceeds $100; and (4) the borrower reasonably believed either that the lender has used extortion to collect other debts or that the lender has a reputation for doing so. There plainly was evidence from which the jury could conclude that each of these factors was present. Since there is no constitutional bar to permitting a jury to infer from the coexistence of these four facts that the lender understands that violence will follow nonrepayment of the loan, *United States v. De Vincent*, 546 F.2d 452, 455 (1st Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977), we conclude that there was sufficient evidence of appellant's guilt.

■ Appellant recognizes the force of this argument, but urges that we may not affirm on this theory because the jury was not expressly instructed in terms of § 892(b)'s permissive inference. This contention is without merit. The court's charge to the jury stated that appellant could not be found guilty unless the jury found beyond a reasonable doubt that the

aforementioned extension of credit had occurred and that Pallotta had a reasonable apprehension he might suffer harm if he failed to make his payments on time. The judge noted that the rate of interest on the alleged loans was to be 260 percent and that there were no legal means by which appellant could have collected the loan, and he told the jury that it could give "such weight as [it deemed] appropriate" to these facts. This portion of the charge apprised the jury of § 892(b)'s permissive inference without needlessly confusing them with the concept of "prima facie case". Appellant did not object to this portion of the charge, and since the charge cannot be said to be plain error, appellant may not attack the judgment of conviction on count 2 on this ground.[1]

■ But we need not rest our decision on this ground alone, for there was evidence from which the jury could infer that appellant understood that violence would accompany the nonrepayment of this loan. The statements appellant made during the recorded telephone conversations could suggest to reasoning minds that the use of violence against borrowers, like Pallotta, who had failed to make timely payments, was a familiar practice for appellant and, indeed, that it was such a familiar practice that he feared that the government might be investigating him.[2] These statements, together with the nature of the loan and the other facts in evidence, warranted a jury conclusion that appellant did in fact understand that violent measures might be employed if Pallotta failed to make a repayment.

■ It having been established that appellant loaned the money to Pallotta with the understanding that any delay in the repayment thereof could result in the use of violence, the next question we must face is

---

1. Here, as in *United States v. De Vincent, supra,* the judge's charge left no doubt but that the ultimate fact which was in issue was whether an extortionate extension of credit had occurred.

2. We recognize that these statements were made several months after the loan, but we see no problem with using them as evidence of appellant's state of mind at the time of the original extension of credit. *See generally* 6 Wigmore on Evidence § 1732 at 103–04.

whether there was sufficient evidence on count one, which charged that appellant conspired with Halloran, Matera, or Pagano to make this extortionate extension of credit to Pallotta. We focus on Matera, and we find ample evidence supporting the jury verdict.

■ Matera, who had a reputation as a loan shark in his own right, collected the weekly interest payments from Pallotta for appellant. While the fact of having made collections as such might not be sufficient to make one a co-conspirator, cf. *United States v. Annoreno*, 460 F.2d 1303, 1309 (7th Cir. 1972), here the jury could have reasonably concluded that Matera was not simply appellant's errand boy, but that he was privy to the terms of the extension of credit, was the principal collector, and must have shared appellant's understanding that violence might follow if Pallotta failed to make a repayment. Because Matera was present at the time Pallotta received the $2000 from appellant and because he also made the weekly interest payment collections, there was evidence from which the jury could infer that Matera knew it was a $2000 loan at 260 percent interest which had not been documented in writing and which had not been secured by any collateral. As the man responsible for the weekly collections, we think the jury was also entitled to assume that he understood both from appellant and from the nature of the loan that violent measures might have to be used to ensure that repayments occurred as scheduled.[3]

■ Count four charged Martorano with having used extortionate means to collect an extension of credit by ordering Halloran to "burglarize" Pallotta's club on or about October 31, and count three charged him with conspiracy to collect an extension of credit by extortionate means. The record plainly contains substantial evidence both that a "larceny" occurred and that it was at appellant's direction. There would seemingly be no question but that the judgments of conviction on both counts were supported by sufficient evidence.

A problem arises, however, because the jury acquitted Halloran on both counts three and four. Appellant urges that the jury must be taken as having rejected Pallotta's account of Halloran's actions. He contends that the guilty verdict on count four must be set aside because Pallotta's account of Halloran's actions is the only evidence against appellant and that the conspiracy conviction under count three may not be upheld on the theory he conspired with Halloran. Appellant understands that it has been settled in the federal courts since *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) that a jury verdict may not be set aside on the ground that it is inconsistent with a second verdict that was simultaneously rendered, *see also Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1973), but he argues that there should be an exception to this general rule here where, in his view, the court's instructions permitted the jury to return a guilty verdict against Martorano only if it first found Halloran guilty.

Even if we were disposed to create such an exception to the rule of *Dunn v. United States*, it would not aid appellant. While it is true that the district court's charge at one point stated that appellant should be found guilty if the jury concludes that Halloran had gone to Pallotta's club at appellant's direction, the thrust of the charge was that appellant should be found guilty if

---

**3.** The district court's unobjected to instructions on the conspiracy counts referred to Pallotta's fearful state as an element of the crime. Appellant argues that this instruction was plain error because the actual understanding of the victim need not be proved to establish conspiracy to make an extortionate extension of credit. *See United States v. Annoreno, supra*, at 1309 n. 7. We find no plain error. Although appellant is correct that the ultimate fact to be proved under a conspiracy count is the intent of the alleged co-conspirators, it is not necessarily the case that the mental state of the victim is irrelevant to this determination. Under § 892(b), the victim's understanding is one of the factors from which the jury may infer the lender's intent, and we cannot say it was plain error for the district court to permit the jury to consider the victim's understanding in this context as well.

he performed the illegal act through the agency of another person. A major issue at the trial was whether there was sufficient evidence identifying Halloran as the assailant—this being one aspect of Pallotta's account which was not corroborated by the witnesses inside the club. Here, the jury could have consistently reached its verdicts by accepting every aspect of Pallotta's testimony except the portion that identified Halloran as the assailant.[4]

But we need not rest our decision on this ground. The settled rule in the federal system is that it is the prerogative of the jury *simultaneously* to return inconsistent verdicts. We have been cited to no case which recognizes the exception appellant urges us to adopt, and any such exception, in our view, would be both unwise and arguably inimical to the interests of criminal defendants generally. The present rule permits the jury to enter into compromises and to act out of leniency; if it were to be changed, the jury would have to be instructed that any inconsistencies in their verdicts would vitiate any guilty verdicts they might return, and the net result might be that fewer defendants would be acquitted on individual counts. And such an exception would be unwise. The jury's deliberations have always been regarded as sacrosanct, and the adoption of appellant's proposed exception would undermine the strong policy against probing into the jury's logic or reasoning and would open the door to interminable speculation.[5] *See United States v. Zane*, 495 F.2d 683, 690 (2d Cir.

1974). Accordingly, we decline to accept appellant's invitation.

II. Evidentiary Rulings

1. As we have noted, the district court permitted Pallotta to testify concerning Martorano's reputation for collection practices. Appellant does not object to the introduction of this testimony per se, but he argues, first, that the district court erred in admitting the testimony without first conducting a voir dire to determine the reasonableness of the answers Pallotta was to give and, second, that it compounded the error by prohibiting appellant from testing the reasonableness and basis for the reputation testimony. Neither contention has merit.

Under general principles of evidence law, reputation testimony is properly admitted if the witness is shown to live and work in the same community as the subject of the testimony and if the witness is familiar with the subject's reputation for a particular pattern of behavior. *See Whiting v. United States*, 296 F.2d 512, 517 (1st Cir. 1961) and authorities cited. Common law evidence principles do not require the judge to make a preliminary determination concerning the reasonableness of any particular answer. Here, the admission of the reputation evidence was authorized by § 892, and it does not purport to create a contrary rule.[6] *See generally United States v. Bowdach*, 501 F.2d 220, 225–26 (5th Cir. 1974). In the absence of any such provision, we assume

---

4. The judge's instructions indicated that the indictment stated the actual charges. Both counts three and four referred to unknown individuals who had been involved in the alleged criminal activity. The jury verdicts thus would have been consistent with the judge's charge if the jury had concluded that appellant's agent and co-conspirator was not Halloran but one of the unknown individuals referred to in the indictment.

5. The cases appellant relies upon, *see Sealfon v. United States*, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948); *cf. United States v. Zane*, 495 F.2d 683, 691–92 (2d Cir. 1974), involve the very different situation in which a prior jury verdict is held to have a res judicata effect and to bar a subsequent prosecution.

6. Section 892(c) establishes several preconditions to the introduction of reputation testimony by witnesses other than the borrower, but there is no requirement that there be a preliminary showing that the answers are reasonable. *See also* § 894(c). Section 892(b)(3)(B) authorizes the debtor to testify as to the lender's reputation. *See United States v. Bowdach*, 501 F.2d 220, 225–26 (5th Cir. 1974). While this provision gives direct substantive significance to the debtor's reasonable belief as to the creditor's reputation, nothing therein suggests that the admissibility vel non of the borrower's testimony is to be governed by a special rule.

Congress intended that these provisions be administered in accordance with normal evidentiary practice, and, under it, the admission of Pallotta's reputation testimony was entirely proper.

■ Appellant's second contention is based upon the district court's refusal to permit him to ask Pallotta the names of the individuals who had told him about appellant's collection practices. We observe that a party, of course, has the right to attempt to impeach or challenge any testimony concerning the reputation of an individual. And here, where the borrower's reasonable belief regarding the lender's reputation for collection practices could have direct substantive significance, *see* § 892(b), it is imperative that a defendant be permitted to explore the basis for the debtor's belief and to attack or otherwise challenge the borrower's testimony. We recognize that many courts have held that it is permissible to question a reputation witness as to the specific persons who served as his sources. *See* 4 Wigmore on Evidence (1972) § 1111 at p. 246 and cases cited in n. 1. But here we need not address the question whether such a rule generally should be followed. Under the specific circumstances of the case at bar we believe it was not reversible error for the district court to foreclose the inquiry.

■ We note, first, that appellant's interest in this inquiry is less substantial than might first appear. If Pallotta had been required to answer, appellant would have had to accept whatever responses were given, inquiry as to whether any or all of the named sources had actually given him the information being clearly collateral. Appellant's interest in this line of questioning was limited to attempting to cast doubt on Pallotta's conclusory assertions by showing that no specific sources existed.

■ Here, the evidentiary ruling interfered only minimally with this interest. The responses Pallotta gave to the appellant's counsel before the district judge cut off the questioning indicated that Pallotta probably could have listed a number of names but, for some reason, was very reluctant to do so.[7] In precluding further inquiry, we think the district court probably concluded that Pallotta could have given the names of specific individuals but feared exposing them to reprisals. While there was no specific evidence that any reprisals had been threatened, we think, given the nature of the prosecution and the Congressional concerns, *see* Conf.Rep.No. 1397, 90th Cong., 2d Sess., 2 U.S.Cong. & Admin.News, pp. 2021, 2026 (1968), that the district court here had the discretion to cut off the questioning to protect third persons in the community. *Cf.* Fed.R.Evid. 403. Since it appeared that Pallotta could have given names, the inquiry would probably have availed appellant little. Moreover, the evidentiary ruling placed only a minor restriction on appellant's ability to challenge the foundation for Pallotta's beliefs.

■ There were a number of traditionally accepted devices by which appellant could have cast doubt upon or attacked the reasonableness of Pallotta's belief. First, appellant could have required Pallotta to specify the particular rumors of misconduct or statements he heard which led him to assert that appellant had a reputation for violent collection practices, from how many people he had heard these rumors, and whether he actually knew of any incidents. *See* Wigmore on Evidence § 1111 at 245.[8] If Pallotta had been unable to respond with specifics, his broad assertions presumably would have been doubted by the jury. And other, perhaps less effective, devices were

---

7. Q. Would you tell us, sir, from whom you received that street knowledge. Tell us the names of the persons.
   A. I have to go through the whole North End.
   Q. Tell me the names.
   A. Common street names.
   Q. Tell me the name of a particular person who told you about—

[Government's Attorney]: Objection, your honor.
The Court: Sustained.

8. Indeed, the decision to pursue the names of sources rather than these other approaches is consistent with a tactical purpose to gain some advantage from Pallotta's obvious reluctance to name specific individuals.

available: e. g., introducing reputation evidence contrary to Pallotta's, or, as appellant actually did, introducing evidence of specific acts which were inconsistent with the supposed reputation. While we find no reversible error here, we recognize the danger of allowing prejudicial reputation testimony without any realistic testing for its credibility. To the extent that a strong foundation has not been developed prior to admission, a court should not be too strict in restricting cross-examination.

2. At trial the court permitted the government to introduce the statements Matera and Pagano made during recorded telephone conversations with Pallotta under the co-conspirator exception to the hearsay rule. Appellant objects that there had not been a sufficient prior showing that a conspiracy existed. We find no error.

We recently indicated our view that the new federal rules of evidence, which were in effect at appellant's trial, introduced significant changes in the administration of the co-conspirator exception to the hearsay rule. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). Without repeating what we said in that case, we read the new rules as committing the question of the admissibility of the statements of an alleged co-conspirator exclusively to the trial judge. The district judge will admit the hearsay declarations if he determines, by a preponderance of the evidence, that a conspiracy existed, that the declarant and the defendant were members of it at the time the statements were made, and that the declarant's statements were made in furtherance of the conspiracy. *See* Fed.R.Evid. 104(a), 104(b), 801(d)(2)(E). The new rules permit a trial judge to base his determination on hearsay and other inadmissible evidence, including perhaps the very statement seeking admission. Fed.R. Evid. 104(a); *see United States v. Petrozziello, supra* at 23 n. 2.

Here, the trial court made a preliminary determination that there had been a sufficient showing of conspiracy to permit the introduction of the statements of Matera and Pagano, and it followed the pre-federal rules practice of instructing the jury that it could not consider the statements unless it first found that the independent nonhearsay evidence established the existence of a conspiracy beyond a reasonable doubt. Naturally, the only question we must now review is whether the district court erred in making the threshold determination that there had been a sufficient showing that a conspiracy existed to place the statements before the jury. *See United States v. Petrozziello, supra* at 23. In making this decision, it seems that the district court may have followed the federal rules to the extent of considering evidence other than the independent nonhearsay variety: it allowed the government to argue in favor of the admissibility of some of the statements by referring to the evidence of a conspiracy contained in the statements seeking admission. Although the district court did not make an explicit finding that a conspiracy existed between appellant and the two declarants, appellant requested no such finding and, in view of the fact that *Petrozziello* had yet to be decided, this was not plain error. *See id.* As we did in *Petrozziello*, we will consider the evidence supporting the existence of the alleged conspiracies. Because, in each instance, we believe the evidence makes the existence of a conspiracy more likely than not, we affirm the district court's evidentiary rulings.

We have already detailed the evidence which was sufficient to permit the jury to find that Matera and Martorano had conspired together, and we believe it preponderates in favor of the existence of the conspiracy. Pagano presents a somewhat closer question. Pallotta testified that he and Matera had been partners in a loan shark operation for years.[9] While this fact alone does not establish that Pagano was a

9. Although this evidence was admitted subject to the limitation that it could only be considered as to Pallotta's state of mind, Fed.R. Evid. 104(a) permits the district court to consider such statements for their truth in determining the existence of the preliminary fact of the existence of a conspiracy.

member of the Martorano-Matera conspiracy, there is the additional fact that Pagano and Matera together went to Pallotta's club to collect one of the interest payments. In view of the evidence that the two men were long-time loan shark partners, we think it reasonable to infer that Pagano's presence on this particular occasion was not a coincidence, but rather was because Pagano was taking part in this particular extortionate extension of credit. While this independent, nonhearsay evidence of Pagano's involvement is not terribly compelling, we think the district court could properly take account of a fact which was revealed by the statements seeking admission: that Pagano and Matera had supplied half the money which Martorano gave Pallotta. This additional fact, when considered together with the independent nonhearsay evidence, provides a solid basis for our conclusion that Pagano and appellant were involved in a conspiracy.

We are aware that *United States v. Glasser*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), rejected the view that the existence of a conspiracy could be proved by the very statement seeking admission. The new rules, however, explicitly contemplate the consideration of such hearsay evidence in making preliminary findings of fact. We believe the new rules must be taken as overruling *Glasser* to the extent that it held that the statement seeking admission cannot be considered at all in making the determination whether a conspiracy exists. *Glasser*, however, still stands as a warning to trial judges that such statements should ordinarily be given little weight. Here, where there is significant independent evidence of the existence of a conspiracy and where the statement seeking admission simply corroborates inferences which can be drawn from the independent evidence, we see no problem with the consideration of that statement.

We also are not persuaded by appellant's further argument that the tapes affirmatively disclose that Pagano had withdrawn from the conspiracy and that his declarations thus did not fall within the ambit of the co-conspirator exception. In the conversations, Pagano expressed his willingness to help arrange further payments to appellant, and we think the district judge reasonably inferred that Pagano was still a member of the conspiracy.

3. Next, appellant argues that the district court committed reversible error by refusing to permit him to cross-examine Pallotta regarding specific threats of harm which were made by loan sharks other than appellant. Appellant urges that Pallotta's answers to these questions would have tended to show that Pallotta had not been in fear of appellant at all, but rather feared harm solely from other loan sharks. We find no reversible error.

We think it doubtful that Pallotta's fear of other loan sharks was probative of whether he was in fear of appellant, but even if the line of inquiry was a material one, we do not believe appellant can claim any prejudice. It was established at trial that Pallotta was terrified of several loan sharks other than appellant, and there was testimony from a government agent suggesting that these other men were the principal objects of Pallotta's fear. Since the jury was in possession of sufficient information concerning Pallotta's state of mind to make a judgment, the restriction on cross-examination was not reversible error. *See United States v. Turcotte*, 515 F.2d 145, 151 (2d Cir. 1975); *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir. 1972).

None of the other points appellant raises require discussion.

*The judgment of conviction is affirmed.*