The court having reviewed the submissions of the parties; and

For the reasons stated in the court's opinion filed this date

IT IS on this 4th day of May, 1987, hereby

ORDERED that the motion of defendant Revlon (Puerto Rico), Inc., for summary judgment regarding Counts I, III and IV of the complaint is DENIED; and it is

FURTHER ORDERED that the motion of defendant Revlon (Puerto Rico), Inc., for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), regarding Counts II, V and VI is GRANTED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that plaintiff is granted leave to amend the Complaint to combine Counts III and IV into a single Count, and to allege in that Count that her discharge violated the public policy underlying 24 V.I.C. § 285.

No costs.

**UNITED STATES of America, Plaintiff,**

v.

**Richard DRAY and Paul Ochs, Jr., Defendants.**

**Crim. No. 86–333–WD.**

United States District Court, D. Massachusetts.

May 5, 1987.
Revised May 12, 1987.

**1428**

William P. Homans, Jr., Homans, Hamilton, Dahmen & Marshall, Boston, Mass., for defendant Dray.

Earle C. Cooley, Thomas G. Guiney, Cooley Manion, Moore & Jones, Boston, Mass., for defendant Ochs.

Robert J. Cordy, Special Asst. U.S. Attorney, Boston, Mass., for the United States of America.

## MEMORANDUM REGARDING POST–TRIAL MOTIONS

WOODLOCK, District Judge.

The defendants, both found guilty by a jury on Count One—the conspiracy count—of a six-count indictment charging their participation in a conspiracy to use the mails in connection with a scheme to defraud,[1] have each brought motions under Fed.R.Crim.P. 29(c) and Fed.R.Crim.P. 33 seeking to have the jury's verdicts set aside.[2]

The essential attack of these post-trial motions is that certain evidence—specifically the "hearsay" conversations between the unindicted coconspirator Robinson, who testified at trial, and the defendant Dray, who did not take the stand—should not have been admitted against the defendant Ochs. Without that evidence, Ochs argues, the jury would not have had a sufficient basis to support its verdict of guilty against him. Dray, in turn, argues that there can be no conviction against him on conspiracy if the conviction of Ochs fails.

The defendants' claims require focus upon the point of intersection between the law of conspiracy and the law of evidence permitting statements of coconspirators to be admitted despite hearsay objections. The configuration of this intersection is brought into bold relief here because the coconspirator statements are the principal means of illuminating the case against Ochs and their admission will determine the validity of the jury verdicts on the conspiracy charge.

The conspiracy charged in Count One had three facets. The defendants were alleged, in the words of the indictment, to have defrauded:

(a) The City of Boston and its citizens of approximately $12,000 in additional permit fees which should have been paid the City in connection with the issuance of the building permit for the 477–481 Washington Street project;

(b) The City of Boston and its citizens of their right to have the affairs of the City conducted honestly, impartially, and free from corruption, fraud, and undue favoritism; and

(c) The firms of Mirabassi and Associates and Temple Place Associates who were double billed for the same purported legal services performed by Dray in connection with his filing of the building permit application for the 477–481 Washington Street project.

Indictment, paragraph 14.

The ultimate issue both on the question of coconspirator statement admissibility and the question of conspiratorial responsibility is the same: whether Ochs and Dray were members of the conspiracy charged in the indictment. But while the ultimate issue may be the same, the manner of determining the questions is not. Separate fact finders, respectively the judge and jury, answer the admissibility and the responsibility questions. And the separate fact finders apply different standards of proof.

These differing responsibilities and distinct standards have generated considerable uncertainty in this area of the law. There is the potential that much of the uncertainty will be resolved by the Supreme Court decision in a case argued this spring. *Bourjaily v. United States,* 781 F.2d 539 (6th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 246 (1986). In order that my grounds for de-

---

1. The defendants were both acquitted on the five substantive mail fraud counts charged. Motions for Judgments of Acquittal were granted at the conclusion of the Government's case as to Counts 2, 3, and 5. The jury rendered not guilty verdicts on Counts 4 and 6.

2. Both defendants seasonably moved for judgments of acquittal at the close of the Government's case and thereafter at the close of all the evidence. Although those motions were then denied as to Count One, I invited their resubmission after the jury's verdict in order to permit a more extended analysis of the defendants' contentions.

termination may be fully subject to review and the result I reach capable of adjustment at a time when this uncertainty has been resolved, I will make an extended differential analysis of the evidence received by the jury in this case.

Initially, however, I must address the question whether all the evidence the jury heard should properly have been considered by them. Before evaluating the sufficiency of the evidence, it is necessary to outline the law affecting what evidence could properly come before the jury. This requires examination of the coconspirator exception to the hearsay rule as it has evolved to date in the First Circuit since its codification in the Federal Rules of Evidence.

## I

The First Circuit was quick off the mark in construing the codification of the coconspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).[3] In *United*

**3.** The provision for admitting the declarations of alleged coconspirators is sometimes referred to in this memorandum as an exception to the hearsay rule. It should be noted, however, that the drafters of the Federal Rules of Evidence chose to style these declarations as "Statements which are not hearsay," Fed.R.Evid. 801(d), rather than as exceptions. *See* Fed.R.Evid. 803, 804. This drafting distinction was designed to emphasize the conceptual difference between admissions, such as coconspirator declarations, and the traditional *exceptions to the hearsay* rule. *See generally* McDaniels, *Rule 801: More Than A Definition,* 2 Litigation 17, 19 (Fall 1975). The practical effect of Rule 801(d) and Rules 803 and 804, however, is the same: they function as exceptions to the normal operation of the hearsay rule.

**4.** The First Circuit's precise formulation in *Petrozziello* of the necessary factual predicates for admission of coconspirator statements has proved troublesome. It appears to require that the defendant against whom the statement is offered be a member of the conspiracy at the time the statement is made, 548 F.2d at 23 ("[I]f it is more likely than not that the declarant and the defendant *were members of a conspiracy when the hearsay statement was made,* and that the statement was made in furtherance of the conspiracy, the hearsay is admissible.") (emphasis supplied). The apparent requirement of contemporaneity between the statement and defendant's membership in the conspiracy was repeated in the authoritative statement of rules the trial courts should follow in considering

*States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977), the Court determined that under the new regime of the recently enacted Federal Rules of Evidence the jury would no longer have responsibility for deciding the admissibility of an out-of-court declaration. The question of admissibility would henceforth be answered conclusively by the trial judge, eliminating the jury's role at the admissibility stage. *Id.* at 22–23.

This recognition of the reallocation of responsibility between judge and jury under the Federal Rules of Evidence was accompanied by the formulation of two corollary principles:

First, the Court held that the proper standard for determining admission of coconspirator declarations was the civil standard requiring the government to show it is "more likely than not" that the declaration was made by a conspirator in furtherance of a conspiracy in which the defendant against whom it is offered became a member.[4] *Id.* at 23.

proffers of evidence under Fed.R.Evid. 801(d)(2)(E). *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). It has been restated as recently as March 27 of this year. *United States v. Wiseman,* 814 F.2d 826, 829 (1st Cir.1987).

On March 2 of this year, however, the First Circuit expressly repudiated the requirement of contemporaneity as "untenable," observing that the apparent "limitation implied [in *Petrozziello*] was inadvertent and is hereby withdrawn." *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987). In its most recent statement on this issue the Court, despite the intervening return to the requirement of contemporaneity in *Wiseman,* reaffirmed *Baines. United States v. Masse,* 816 F.2d 805, 811 (1st Cir.1987) ("Once found to be a member of a conspiracy, a defendant is subject to proof of the prior acts and comments of his coconspirators. A statement made by a coconspirator, if in furtherance of the conspiracy, is therefore admissible against the defendant *even if made prior to the defendant's* involvement in the conspiracy").

Under *Baines* and *Masse* the recent formulation of the rule in *United States v. Williams,* 809 F.2d 75, 89 (1st Cir.1986) seems accurate. ("*Petrozziello* and its progeny require[ ] the trial court to find, by a preponderance of the evidence standard, that a conspiracy existed, that [the defendant] *became* a member of the conspiracy, and that the declarations were made in furtherance of the conspiracy.") (emphasis added).

Second, the Court determined that in making a ruling on the admissibility issue, the trial judge could consider the statements offered for admission. *Id.* at 23 n. 2. In so ruling, the *Petrozziello* Court acknowledged that it was effectively disregarding a pre-Federal Rules of Evidence Supreme Court case in the area, which proscribed the use of the statements seeking admission. *Glasser v. United States,* 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942) (coconspirator statements are admissible against a defendant "only if there is proof *aliunde* that he is connected with the conspiracy. Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence.").

The First Circuit's establishment of the civil standard of proof for the admissibility determination found favor in other Circuits.[5] The notice of the demise of *Glasser,* however, has proven premature; it has not been well received in other Circuits [6] or for that matter even in subsequent First Circuit cases.

In its next confrontation with the coconspirator hearsay rule after *Petrozziello,* 548 F.2d 20, the Court firmly concluded that the new Federal Rules of Evidence "must be taken as overruling *Glasser* to the extent that it held that the statement seeking admission cannot be considered at all in making the determination whether a conspiracy exists." *United States v. Mar-*

*torano,* 557 F.2d 1, 12, *reh'g denied* 561 F.2d 406 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978).

But when the case came on for rehearing regarding the issue whether *Glasser* had in fact been partially overruled, the First Circuit softened its observations to the status of dicta. While continuing to express doubts about the viability of *Glasser,* the Court found that the purported hearsay conversations were properly admitted on bases other than the coconspirator exception. 561 F.2d at 409. The Court, therefore, held on rehearing that its decision rested "solely upon our view that the 'independent' evidence established the existence of a concerted mutual venture." *Id.*

The subsequent history of the coconspirator exception in the First Circuit has left the independent evidence requirement of *Glasser* in suspension. Articulations of the rule have been various and at least facially inconsistent. *Compare United States v. Nardi,* 633 F.2d 972, 974 (1st Cir.1980) (admissibility determination rests on consideration of independent non-hearsay evidence) with *United States v. Drougas,* 748 F.2d 8, 29 (1st Cir.1984) (adhering to "previous[ ] state[ment] that 'hearsay and other inadmissible evidence, including perhaps the very statement seeking admission,' can be considered by the district court in ruling on

---

**5.** *See, e.g., United States v. DeJesus,* 806 F.2d 31, 34 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987); *United States v. Ammar,* 714 F.2d 238, 249–251 (3d Cir.1983), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Chindawongse,* 771 F.2d 840, 844 (4th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 859, 88 L.Ed.2d 898 (1986); *United States v. James,* 590 F.2d 575, 582–583 (5th Cir.1979) *(en banc ), cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Vinson,* 606 F.2d 149, 152 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. Jefferson,* 714 F.2d 689, 696 (7th Cir. 1983); *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978); *United States v. Andrews,* 585 F.2d 961, 965 (10th Cir.1978). *But see United States v. Jackson,* 627 F.2d 1198, 1219 (D.C.Cir. 1980) (substantial evidence); *United States v. Weiner,* 578 F.2d 757, 768 (9th Cir.1978), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) ("sufficient, substantial evidence to establish a *prima facie* case").

**6.** *See, e.g., United States v. DeJesus,* 806 F.2d 31, 34 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 261 (3d Cir.1983), *rev'd on other grounds sub nom, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Gresko,* 632 F.2d 1128, 1131 (4th Cir.1980); *United States v. James,* 590 F.2d 575, 581 (5th Cir.1979) *(en banc ), cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Santiago,* 582 F.2d 1128, 1133 n. 11 (7th Cir.1978); *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978); *United States v. Miranda-Uriarte,* 649 F.2d 1345, 1349 (9th Cir.1981); *United States v. Andrews,* 585 F.2d 961, 966 (10th Cir.1978); *United States v. Monaco,* 702 F.2d 860, 876 (11th Cir.1983); *United States v. Jackson,* 627 F.2d 1198, 1215 and 1215 n. 34 (D.C.Cir.1980). *But see Bourjaily v. United States,* 781 F.2d 539, 542 (6th Cir.1986), *cert. granted,* — U.S. —, 107 S.Ct. 268–269, 93 L.Ed.2d 246 (1986).

the admissibility of coconspirators' statements"). Canvassing the cases just last year, the Court candidly noted that "[o]ur opinions on this issue have been less than clear." *United States v. Johnston,* 784 F.2d 416, 422 (1st Cir.1986).

In *Johnston,* as in *Martorano*—and apparently in all other cases it has addressed to date—the First Circuit could avoid direct confrontation with the problem because it was satisfied on the basis of independent evidence that the requisite showing of conspiracy participation had been made. But concern with the problem remains. Most recently the First Circuit noted its uncertainty in this area by observing, "This court has not clearly stated whether or not it adopts the majority position ['among the Circuits (that) statements sought to be introduced under Rule 801(d)(2)(E) may (not) themselves be used to establish the existence of the conspiracy and thus to lay their own foundation']". *United States v. Silvano,* 812 F.2d 754, 761 (1st Cir.1987). Observing that the Supreme Court has granted *certiorari* on this issue in *Bourjaily,*[7] the Court held:

> We neither decide this question today nor await the opinion of the Court on the point because we hold that on the record before us there is sufficient independent evidence that it was more likely than not that a conspiracy existed between Silvano and the declarant, and that the statements were in furtherance of the conspiracy, to permit their admission under the Fed.R.Evid. 801(d)(2)(E). *Silvano,* 812 F.2d at 761.

The record here does not, however, permit me to avoid confronting the problems raised by the purported partial reversal of *Glasser.* In this case, the question whether only independent non-hearsay is used for the coconspirator hearsay admissibility determination is outcome determinative.

Consequently, I must resolve the uncertainty for this case at this time.

I turn, then, to the evidence before the jury, separating the coconspirator statements from the independent non-hearsay evidence.

## II

### (A)

The centerpiece of the Government's evidence consisted of conversations between the defendant Dray and the alleged coconspirator Douglas Robinson, an official in the Inspectional Services Department of the City of Boston, during the course of which the scheme to defraud was conceived and implemented. The sole evidence of these conversations came from Robinson.

According to Robinson, the following occurred:

Dray, an attorney with a municipal permit granting speciality, came to Robinson's office in the Spring of 1984 to discuss an application for a construction permit he was going to file on behalf of an unnamed client. Dray told Robinson that the application would be for interior demolition on a former "Five and Dime" located on Washington Street. He told Robinson that the project would cost between $2,000,000 and $2,500,000. Robinson told Dray that sounded like a high estimate for interior demolition. In his testimony before the jury, Robinson stated:

> And I'm not sure if it was him or myself who, you know, said that we could lower the price. And at that time, he said he would go back to I'm not sure if it was the project manager or who it was, but I do know that he referred to it that he was a *neighbor* of his, that had something to do with the project [to discuss]

**7.** The order granting the writ of certiorari in *Bourjaily* is limited to three questions:

"1. Whether, in order to admit an alleged co-conspirator's declarations against a defendant under Federal Rule of Evidence 801(d)(2)(E), the court must determine by independent evidence a) that a conspiracy existed, and b) that the declarant and the defendant were members of this conspiracy.

2. Assuming that the court must make these determinations, upon what quantum of independent proof [must] they be based?

3. Whether, as a requirement for the admission of a coconspirator's statement against a defendant, the court must assess the circumstances of the case to determine whether the statement carries with it sufficient indicia of reliability?" 107 S.Ct. 268 (1986).

lowering the price and we would split the difference in fees.

February 11, 1987 Tr., at 33–34.

A second meeting also took place in Robinson's office perhaps a week or two later, on what the parties agree would have been May 25, 1984. Dray told Robinson:

[H]e had discussed it with this person and that this person wanted, would have to give him two-thirds and we would split the other third in savings.

*Id.* at 34–35.

Robinson then approved the application form Dray presented containing an estimated cost of $1.2 million for the interior demolition plus added work.

About two months later Robinson met Dray at a bar near City Hall. They had a drink and Dray gave Robinson an envelope. Robinson did not open the envelope until after he left the bar. The only conversation Robinson recalled in this encounter was Dray's observation that "he'd [Dray would] see me [Robinson] later on for the remainder." *Id.* at 40. When Robinson opened the envelope after he left the bar he found it contained $400 to $600 in cash. *Id.*

### (B)

Around these centerpiece encounters involving conversations between Dray and Robinson, the Government set out evidence to corroborate Robinson's testimony regarding the creation and execution of the conspiracy and to identify Ochs, whom Robinson could not himself identify, as a participant in it.

Ochs, like Dray, was a resident of Milton. He was the onsite construction supervisor for Temple Place Associates, the owner of the building at 477–481 Washington Street, once a Kresge building. Ochs was instrumental in encouraging Temple Place Associates to engage Dray's services to handle, among other things, municipal administrative matters. It was Ochs who told the General Contractor, Mirabassi and Associates, which had contractual responsibility for the permit payment, that Dray would be handling the instant permit application. As the owner's representative, Ochs signed the permit application ultimately submitted by Dray on May 25, 1984.

The permit application submitted contained a cost estimate of $1,200,000 with a corresponding fee of $11,750. This permit application, which identified the owner as a Philadelphia concern, reflected a substantial change from the much higher construction estimate of $2,425,000 shown on a previous draft Ochs had signed only a day or so before. The previous draft application, which would have required a fee of $23,950, had been prepared by Mirabassi personnel before Dray interceded to lower the estimate and suggest language changes.

Ochs distributed two Dray statements for legal services dated May 29, 1984, to Temple Place Associates and Mirabassi Associates respectively. Although differently phrased, both related to the preparation and filing of the permit. The Mirabassi and Associates' payment for the bill in the amount of $5,975 was deposited in Dray's account on July 3, 1984. Dray made out a check to Ochs for $3,000 on the same day. On July 9, the first business day following the weekend after the Fourth of July holiday, Dray made out a $600 check for cash, the proceeds of which, the Government contended, were used to fund the envelope payment to Robinson.

### (C)

By segregating the independent nonhearsay evidence from the hearsay statements, I have to this point treated examination of the evidence appropriate for determination on the coconspirator hearsay admissibility question as if it were subject to the law of the excluded middle. It is an approach suggested by case law in this area under which an either/or choice is made whether or not to consider statements seeking admission.

But the case law also outlines a middle ground on which to lay the foundation for a more differentiated and comprehensive evidentiary evaluation. The contours of this middle ground were initially identified by the First Circuit in *Petrozziello* itself, where the Court observed that "the *Glas-*

*ser* teaching survives as an admonition that trial judges should give *little weight* to bootstrap evidence in deciding whether to admit hearsay under the coconspirator exception." 548 F.2d at 23 n. 2 (emphasis added). The *Petrozziello* Court quickly added, however, that "[w]e do not chart this terra incognita in detail, for we conclude below that the admissible evidence was enough by itself to meet the standard we apply." *Id.*

The similar observation that *"Glasser* ... stands as a warning to trial judges that [coconspirator] statements should ordinarily be given little weight," is found in the initial *Martorano* opinion, 557 F.2d at 12, coupled with the conclusion that "where there is significant independent evidence of the existence of a conspiracy and where the statement seeking admission simply corroborates inferences which can be drawn from the independent evidence, we see no problem with the consideration of that statement." *Id.* In the opinion upon rehearing in *Martorano* the concept was further refined by formulation of a "require[ment of] significant independent evidence of the existence of the conspiracy, deviating from the *Glasser* practice only to the extent of permitting the district court to consider the independent evidence in the light of the color shed upon it by the highly trustworthy and reliable portions of the hearsay utterance seeking admission." 561 F.2d at 408.

Within the unexplored terrain outlined by the First Circuit's "little weight" admonition,[8] the middle ground for making the admissibility determination can be found by reference to what *Martorano*, on rehearing, speaks of as "the highly trustworthy and reliable portions of the hearsay utterance seeking admission." 561 F.2d at 408. The reference to a reliability analysis directs attention to a body of law which has been more fully developed elsewhere.

Although the parties in this case initially interpreted a pre-Federal Rules of Evidence case, *United States v. Ottomano*, 468 F.2d 269, 273 (1st Cir.1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973), as definitively proscribing reliability analysis in this Circuit,[9] that proscription appears to be observed no longer. The First Circuit itself has recently conducted a reliability inquiry to deal with a related issue of coconspirator hearsay admissibility. *United States v. Fahey*, 769 F.2d 829, 838–40 (1st Cir.1985). In doing so the Court looked to the practice of "the clear majority of courts" which recognize that "possible confrontation clause infirmities may ... present themselves in individual cases and that reliability of coconspirator statements must be examined on a case-by-case basis." *Id.* at 839–40.[10]

A threshold approach to reliability analysis has been to determine whether the hearsay statement was a critical or even significant factor in the conspiracy charged. *Cf.*

---

**8.** It is tempting to characterize the "little weight" admonition as simply an evidentiary application of Thomas Reed Powell's parody Restatement of Constitutional Law paraphrased for this context: In the usual form of Restatements, the black letter text would read: "The trial judge may consider independent non-hearsay evidence in making coconspirator hearsay admissibility determinations." A Comment would add: "The trial judge may also consider the statement seeking admission, but not too much." Finally, there would be the Reporter's Note: "How much is too much is beyond the scope of this Restatement." *Cf.* Freund, *Foreword* to T.R. Powell, *Vagaries and Varieties of Constitutional Law* at ix (1956).

**9.** The Government was apparently confident enough of this proposition that it felt no obligation either to cite cases or adduce argument. This confidence was not without justification. Prior to *United States v. Fahey*, 769 F.2d 829 (1st Cir.1985), First Circuit cases treated summarily the issue whether coconspirator statements were reliable. *See, e.g. United States v. Dunn*, 758 F.2d 30, 39 (1st Cir.1985) ("This court has repeatedly rejected confrontation clause challenges to the admissibility of coconspirator statements.... Coconspirator statements are considered presumptively reliable as declarations against interest") (citations omitted).

**10.** Indeed, the first of the cases cited by the First Circuit in *Fahey* to illustrate this "clear majority" was *United States v. Perez*, 658 F.2d 654, 660–62 (9th Cir.1981). The *Perez* citation is to a passage in which the Ninth Circuit reaffirmed its "disapproval of the First Circuit's assertion [in *Ottomano v. United States*, 468 F.2d at 271] that mere satisfaction of requirements for the coconspirator exception automatically meets all possible confrontation clause infirmities." 658 F.2d at 660 n. 5.

*United States v. Fahey,* 769 F.2d at 840 ("[m]ost importantly ... out of court statements could not have been a critical or even significant factor in [the defendant's] conviction."). Here, there is no question that the Dray-Robinson conversations were not merely crucial to proof of Ochs' guilt; they were arguably a necessity.

■ Moving from the question of the importance of the evidence to the inherent trustworthiness of the statements themselves, two Supreme Court cases, *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) and *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), have outlined a framework for reliability analysis.[11] The considerations outlined in *Dutton* and *Matlock* can be summarized into five areas of inquiry about the challenged out-of-court declaration:

(1) Did the declarant have *personal knowledge* of the subject matter of the declaration?

(2) Did the declarant have a *need or capacity for recollection* of past events in order to communicate the declaration accurately?

(3) Did the declarant have *incentives to misrepresent* the subject matter of the declaration?

(4) Is the declaration *internally consistent?*

(5) Is the declaration *consistent with other evidence?*

■ *Matlock's* reference to the question whether the statement was in fact made, 415 U.S. at 175, 94 S.Ct. at 995, brings another dimension to the reliability inquiry. It has been customary in such an analysis

to look simply at the factors as they relate to the declarant, here Dray, who did not himself testify at the trial. But where the trial judge determines reliability the concern cannot merely be with the out-of-court declarant; it must also encompass the in-court witness who reports the out-of-court declaration. The standard of fair preponderance for an admissibility determination draws the trial judge directly into a fact finding function. A properly conducted reliability analysis must, therefore, examine two tiers of evidence. I am, consequently, not merely examining sufficiency at this stage but will be acting as a rational trier of fact resolving issues of credibility and choosing among varying interpretations of the evidence.

I turn then to the five areas of reliability inquiry and their impact on the two tiers of evidentiary presentation necessary to bring the Dray-Robinson conversations before the jury.

(1) *Personal Knowledge*

It is apparent that the participants to the conversations had personal knowledge of the subject matter of the declarations as they affected their responsibilities in the structure of the conspiracy. Robinson's knowledge of the identities and responsibilities of other participants in the conspiracy was quite limited. He knew only that someone described as Dray's neighbor who had something to do with the project was required to approve the payoff scheme and was extracting a cut from it. Nevertheless, there is nothing unreliable about the personal knowledge aspect of the presentation of the statements. The obvious and conceded limitations on Robinson's person-

---

**11.** In *Dutton,* the Court dealt with a peculiar Georgia variant on the coconspirator hearsay exception which permitted a statement made after the conclusion of the active phase of the conspiracy to be received. A plurality of the Court looked to four factors to determine reliability. Those factors, as restated by the Ninth Circuit in *United States v. Perez,* 658 F.2d at 661, were: "(1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the

circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime."

In *Matlock,* the Court considered whether hearsay statements were sufficiently reliable to be considered as evidence of authority to consent to a search. The factors considered were (1) whether the statement was, in fact, made; (2) whether the statement is internally consistent (3) whether the statement is corroborated by other evidence; (4) whether in light of declarant's penal interest it bears indicia of reliability. 415 U.S. at 175–77, 94 S.Ct. at 995–96.

al knowledge were consistent with the trustworthiness of the statements reported.

### (2) *Need or Capacity for Recollection*

Because the statements were made during the course of and in furtherance of the conspiracy, they can—as a general proposition—be considered the functional equivalent of verbal acts rather than the products of recollection whether faulty or otherwise.[12] As such, the statements themselves were inherently reliable. As to Robinson's report of those statements, however, it is apparent that his recall was less than complete. His recollection of the conversations themselves was not crisp and consisted principally of paraphrasing the substance of the conversations at a relatively high degree of generality. Robinson's limited recall was particularly pronounced, for example, in connection with the third payoff conversation. He was uncertain about the precise amount of the payoff and even the time when the payoff was made.[13]

### (3) *Incentives to Misrepresent*

The participants had no incentives to misrepresent in the conversations between themselves. Because the statements were in furtherance of the common goal of the conspiracy, their reliability was enhanced. These were working discussions in which limited plans were outlined and specific responsibilities allocated for the effective operation of the conspiracy by a small number of conspirators. There is no particular incentive to misrepresent under these circumstances. Indeed, the criminal character of the conversations themselves is a further indicium of reliability because statements made in furtherance of an il-

legal enterprise are inherently against the declarant's penal interest. It has generally been assumed that a person making such a statement has no incentive to misrepresent it. *See, e.g., United States v. Matlock*, 415 U.S. at 176, 94 S.Ct. at 995.

In evaluating the reliability of Robinson's report of the conversations, it is important to consider his incentives at trial. As a convicted perjurer and accomplice in the conspiracy who was testifying pursuant to a plea agreement, Robinson presented the classic profile of an individual whose testimony must be received with caution and evaluated with great care. The reason for that caveat is that such a person is precisely the type of witness who has a very substantial incentive to misrepresent the substance of a conversation or any other evidence.

### (4) *Internal Consistency*

The statements attributed to Dray are internally consistent in that their self-referential logic suggests Dray would need the assistance of another person capable of influencing the payment of expenses on the project in order to generate the cash to make the necessary payoff. The concluding statement that Dray would make up the rest of the money due Robinson under the illegal agreement is also internally consistent. Considered on this ground these statements are trustworthy. Their presentation by Robinson does not make them less so from the perspective of internal consistency.

### (5) *Consistency with Other Evidence*

The statements are largely consistent, but in one particular also inconsistent, with other evidence. The course of dealings be-

---

**12.** Professor Cleary, the reporter for the Advisory Committee which drafted the Federal Rules of Evidence, has, for example, concluded that "virtually all declarations by co-conspirators will be found to qualify as 'verbal acts' and hence not hearsay in the first place, by analysis or rules definition." *McCormick on Evidence* § 53 at 139 (3d ed. 1984) (Cleary ed.). I do not rely upon this exception from the hearsay rule in this case; rather the question must be addressed here from the perspective of the traditional coconspirator exception.

**13.** On direct examination, Robinson placed the payment in July, some two months after the submission of the permit application in May, a timing which was consistent with the Government's financial evidence concerning Dray's receipt of monies from Mirabassi and the payoffs to Ochs by check and to Robinson in cash in July.

On cross-examination, however, Robinson expanded the time period during which the payoff could have been received to include the remainder of 1981. February 12, 1987, Tr. at 17.

tween Ochs and the other interested parties in the transaction was consistent with the identification of Ochs as another coconspirator. Ochs' role in securing Dray's services; his role in signing the relevant permit, after knowing a substantially higher estimate had provisionally been considered appropriate; his role in forwarding the two Dray bills, and his receipt of monies from Dray, contemporaneously with the Mirabassi payment of Dray's bill and the cash payment to Robinson—all are consistent with an interpretation of the coconspirator statements identifying Ochs as the other participant.

The disposition of the payoff monies as proved at trial, however, was as an accounting matter inconsistent with the plan itself. The Government accounted only for a $3,000 payment to Ochs. This payment, depending on the calculation, is variously a 50% (of the cash generated by Dray's Mirabassi bill) or a 33% (of the total savings on the permit fee) payoff. But in any event the Ochs payment does not equal the two-thirds figure allocated for the neighbor associated with the project, as outlined at the second Robinson-Dray meeting. Similarly, the payment to Robinson was a substantial shortfall. This payoff, again depending on the accounting premise, ranged from a maximum of 10% ($600 of $5,950 cash generated) to a minimum of 3% ($400 of $12,200 saved). But in any event the Robinson payment was not the 16.5% figure seemingly contemplated for him at the second meeting. Although inconsistent as an accounting matter, the payoff discrepancies were consistent with Robinson's testimony that, while he chose not to pursue Dray further for the remaining monies, he believed he had not received his full share.

### III

■ Under the preponderance standard, the trial judge functions as an independent fact finder at the admissibility stage. The trial judge's determination must be grounded upon appraisal of the demeanor and credibility of the witnesses and upon an assessment of the force of inferences to be drawn from the credible evidence. In this case, that process of determination ultimately turns upon my assessment of the credibility of Robinson and the inferences to be drawn from his testimony.

■ On the basis of the evidence before me I found at trial and—after extended reflection in consideration of the post-trial motions—continue now to find Robinson's testimony credible. I have considered his testimony with caution and weighed it with great care given his status as a convicted perjurer who appeared before me as an immunized accomplice witness pursuant to a plea agreement with the prosecution. I have also considered the attacks on his credibility mounted on cross-examination where his recollection of time, place and circumstance was shown to be hazy.

Nevertheless, I credit as more likely true than not Robinson's in-court recounting of the out-of-court conversations with Dray. Having credited Robinson's testimony and finding that the conversations took place as he recounted, I turn to the implications of my reliability determination for the admissibility of coconspirator hearsay, first, if I consider those statements, and, next, if I do not consider the statements.

### (A)

When I consider all the evidence presented to the jury and particularly Robinson's testimony, a single integrated diorama portraying the conspiracy charged in the indictment has been proved more likely than not. Dray's role as the central figure, who linked the developers of the building with the City's regulators of that development, permitted implementation of the scheme. He conducted his City of Boston business through Robinson, a faithless public servant whose services he acquired for his private purposes. With Robinson's assistance he could coordinate the lowering of estimated costs thereby depriving the City of Boston of a proportionately higher building permit fee.

The loss to the City of Boston was mirrored by "savings" to the developers, principally Mirabassi. Those savings—when extracted as legal fees through double billings for the permit process services submitted through Ochs to the two arms of the development team, Temple Place Associ-

ates and Mirabassi and Associates—could be used to generate the cash necessary for Dray to make a payoff to Robinson. The monies generated by the double billing could also be used to make a contemporaneous payoff to the individual who positioned Dray with the developers, the defendant Ochs. I draw the inference that Ochs is the individual to whom Dray was referring in his first and second conversations with Robinson. Seen in that light, Ochs' actions take on full color as the efforts of a conspirator seeking to further the ends of the conspiracy.

### (B)

But without the illumination provided by the Dray-Robinson conversations, I find that the independent non-hearsay evidence against Ochs takes on no sinister cast. Examining the independent non-hearsay evidence unrefracted by the light shed on it by the hearsay declarations I have indicated I would credit is, of course, a classic exercise in the art of prescinding which is said to be a principal characteristic of the legal mind.[14] But that seemingly artificial exercise convinces me that the independent non-hearsay evidence cannot establish a foundation for inferences adequate to prove Ochs' participation in the conspiracy to any rational trier of fact, let alone by a fair preponderance.

The government contends that three pieces of independent non-hearsay evidence are sufficient to sustain its burden of proving Och's participation in the subject conspiracy. I find they are not sufficient whether considered together or separately.

First, on the state of the independent evidence the substantial difference between the estimated construction cost on the draft permit application and that on the final application submitted May 25, 1984, can only be viewed as reflecting the considerable flexibility in the costing of such jobs and the ability to shift costs for tenant improvements to separate applications.

Second, Ochs' presentation of the two bills for Dray's services I find to be a not unreasonable allocation of legal expenses among the interested participants in the project. Temple Place Associates, as a sophisticated purchaser of legal services, was aware that Mirabassi's contract provided for the latter's responsibility for the payment permit expenses. Yet Temple Place Associates paid the relatively modest initial bill for Dray's services. I do not view Dray's bill to Mirabassi to be disproportionate in light of the result: expedited treatment and a greatly reduced municipal fee on a project for which time was of the essence. There is no evidence Mirabassi contested the bill. Ochs' role as middleman for the presentation of the bills does not, in the context of the independent evidence, demonstrate any likelihood of his participation in the conspiracy.

Third, the receipt by Ochs of a $3,000 July 3, 1984, check from Dray is meaningless until the coconspirator statements provide an inculpatory explanation. Unless one indulges the presumption that, in the absence of explanation by Ochs, the receipt of $3,000 from Dray may be assumed to be improper, evidence of the payment has no conspiratorial significance and may not even be relevant. Of course, the presumptions in a criminal case run differently and certainly do not support a finding of participation by Ochs.

Ochs' role takes on a pale tone without the coconspirator statements. He appears to be doing nothing other than what a construction project facilitator in his position would ordinarily do. He arranges to have a skilled attorney handle the administrative process and thereby saves the project substantial permit fees. To project him into the conspiracy on the basis of the independent non-hearsay evidence would be impermissibly speculative.

### (C)

I am left, then, with the circumstance the First Circuit has to date consistently avoided: the case in which a conspiracy is estab-

---

**14.** "If you think that you can think about a thing inextricably attached to something else without thinking of the thing which it is attached to, then you have a legal mind."

Thomas Reed Powell quoted in T. Arnold, *The Symbols of Government* 101 (1962).

lished by a preponderance of the evidence only if the statements seeking admission are themselves considered.

Under now controlling First Circuit law, I understand that I should consider the reliable and trustworthy aspects of the statements offered for admission. Doing so I find that the predicates for admission of the coconspirator statements against Ochs have been met.

Having concluded myself that the predicates for admission of the coconspirator statements under current First Circuit law have been met, I move next to the question of the sufficiency of the evidence before the jury.

### IV

The standard for judicial examination of the sufficiency of the evidence before the jury to support a guilty verdict requires the Court to:

> view the evidence in the light most favorable to the government.... Drawing all legitimate inferences which tend to support the government's case and resolving any conflicts in the evidence against the [defendant] [the] task is to determine whether "the evidence in its totality, taken in the light most flattering to the government, together with all legitimate inferences to be drawn therefrom, [are enough that] a rational trier of the facts could have found the appellant guilty beyond any reasonable doubt."

*United States v. Cintolo*, 818 F.2d 980, 983, (1st Cir. 1987) (citations omitted).

In the context of this case, the question of evidentiary sufficiency has largely been answered by the findings in support of coconspirator statement admissibility. Having made a finding myself that proof of the conspiracy and Ochs' participation in it has been adequate to convince me as fact finder that the charge is more likely true than not, I have no hesitation in concluding that another rational fact finder could find the proof to be sufficient to establish guilt beyond any reasonable doubt. Consequently, I will deny Ochs' post-trial motions to the degree that they rest upon contentions that the evidence against him was insufficient.[15]

### V

The defendant Dray's motion for judgment of acquittal is presented in a contingent manner. It is his position that if Ochs' Motion for Judgment of Acquittal is granted then there is an insufficient basis for Dray himself to be convicted of conspiracy. Because Ochs can be acquitted under one of the potential scenarios I have outlined—that in which I am limited to independent non-hearsay evidence in the admissibility ruling, *see* Section III.(B) *supra*, it is appropriate for me to consider Dray's contingent motion.

The evidence adduced in this case can support only the conclusion that there were three conspirators—Dray, Ochs and Robin-

---

**15.** The degree of symmetry between a judge's preponderance-based admissibility ruling and that judge's ruling on the sufficiency of evidence to support a jury's reasonable doubt-based verdict cannot be explored fully on this record. The rulings are, of course, distinct and cannot properly be compared as if they were elements of the same hierarchy. *See generally* February 23, 1987, Tr. at 77–80.

While I have concluded in this case that the coconspirator statement admissibility finding permitting the statements to be received can be a predicate for the sufficiency finding as well, this may not always be true. A trial judge, for example, may find the evidence supports that judge's preponderance ruling but still is insufficient to support a rational juror's reasonable doubt finding.

By the same token, it is not clear as a general proposition that the failure to make the hearsay admissibility finding will necessarily result in preclusion of a sufficiency finding as to the independent non-hearsay evidence. In his preponderance finding the trial judge may choose to disbelieve the Government's witnesses and decline to draw inferences in the Government's favor. But in ruling on sufficiency, the trial judge may not introduce his personal evaluation and must treat the evidence in the light most favorable to the Government. *Cf. United States v. McNatt*, 813 F.2d 499 (1st Cir.1987). In this case, however, I have not merely ruled on the basis of inferences I draw from the evidence I consider credible that the independent evidence is inadequate to prove Ochs' participation in the charged conspiracy by a fair preponderance, I have also concluded that no rational fact finder could on such evidence conclude beyond a reasonable doubt that Ochs was a participant in the charged conspiracy.

son. Assuming that Ochs is acquitted because certain evidence admissible against Dray is not admissible against him, only two possible conspirators remain, Dray and Robinson. Unless there is sufficient evidence to support the conclusion that Robinson participated in the same conspiracy as Dray, Dray cannot stand convicted of that conspiracy alone. This result is mandated by the fatal inconsistency in a jury verdict which convicts only one of the potential conspirators in a single proceeding in which all of his alleged coconspirators are found not to have participated in the charged conspiracy.[16]

It is Dray's contention that there is insufficient evidence to support the conclusion that Robinson formed the requisite criminal conspiratorial intent. Dray does not suggest that Robinson lacked the requisite intent to defraud. Rather he contends that the requisite intent to use the mails has not been shown as to Robinson.

The law of mail fraud has developed with judicial concern that the use of the mails be intentional and knowing. This is consistent with the plain language of Title 18 U.S.C. § 1341. Relying upon *United States v. Reed*, 721 F.2d 1059, 1061 (6th Cir.1984), and *United States v. Craig*, 573 F.2d 455, 486 (7th Cir.1977), in charging the jury in this case, I made reference to the requirement of knowledge that the use of the mails was reasonably foreseeable.[17] The reasonable foreseeability standard has, since this trial, been explicitly embraced by the First Circuit in *United States v. Silvano*, 812 F.2d at 760. I turn then to the question whether Robinson had the requisite culpability.

The burden of showing reasonable foreseeability is not overwhelming. The First Circuit has recognized general business knowledge to be sufficient when coupled with knowledge of the aim of conspiracy. *United States v. Ciampaglia*, 628 F.2d at 637. It may be inferred that Robinson, an experienced public official in this field, had such business knowledge about the manner in which communications in a multi-million dollar construction project would be conducted. The jury could find he had the requisite notice of potential mailing needs,

16. The premise of inconsistency upon which this conclusion is based is an application of what the First Circuit has recognized as a well-established exception to the general rule against overturning inconsistent jury verdicts. This is "the principle that a conspiracy conviction of one defendant will not be upheld when all other alleged coconspirators are acquitted in the same trial." *United States v. Morales*, 677 F.2d 1, 3 (1st Cir.1982). Acquittal by the trial court of other coconspirators upon post-trial motion challenging evidentiary sufficiency has been considered the functional equivalent of acquittal of all other alleged coconspirators at the same trial, *Hartzell v. United States*, 322 U.S. 680, 682 n. 3, 64 S.Ct. 1233, 1234 n. 3, 88 L.Ed. 1534 (1944), as has acquittal on grounds of evidentiary sufficiency on appeal. *United States v. Williams*, 503 F.2d 50, 54–55 (6th Cir.1974).

This case is arguably distinguishable as one in which the acquittal of the coconspirator Ochs would be on the basis of the exclusion of evidence after the jury's verdict. Further, the Government contends that it could not have foreseen the need to establish fully the unindicted coconspirator Robinson's conspiratorial intent. But these distinguishing features are not persuasive. Even under the sceptical analysis of exceptions to the general rule against overturning inconsistent jury verdicts adopted by the Fifth Circuit panel in *United States v. Espinosa-Cerpa*, 630 F.2d 328, 330–333 (5th Cir. 1980), such bases for distinguishing this case

would be irrelevant. This is because the reason for finding the other potential coconspirators not culpable would clearly be failure of proof in a single proceeding. An acquittal of Ochs on the basis I have outlined would unequivocally reflect a failure of proof on the part of the prosecution. That the prosecution did not develop sufficient evidence regarding the unindicted coconspirator is no less a fatal failure of proof if it is found to occur in the same proceeding.

17. In his motion for a new trial Dray lists as one ground the purported failure to charge properly on the intent required for conspiracy to commit mail fraud. No objection was taken to the basic charge on this ground—although one was taken to an answer to a jury question which largely restated the basic charge as to this issue. There has been no briefing of this ground for new trial relief and I note that Dray now appears satisfied with the reasonable foreseeability instruction in the answer to the jury question. In his brief in support of the motion for judgment of acquittal, Dray states, "This Court, in its instructions to the jury in answer to its question, wisely, we submit, defined the required intent in terms of reasonable foreseeability rather than terming 'knowledge' what we submit is intent." *Defendant Richard M. Dray's Memorandum of Law In Support of his Motion for Judgment of Acquittal* at 13.

because the permit application showed clearly that while Temple Place Associates, the owner, was an out-of-state entity, the owner's representatives such as Dray and his neighbor were located in Massachusetts. These facts, while bare bones, are sufficient to give rise to a reasonable jury inference, *United States v. Soteras*, 770 F.2d 641, 645–46 (7th Cir.1985), supporting a finding that Robinson himself had the requisite knowledge that use of the mails in connection with the agreed upon scheme to defraud was reasonably foreseeable. Accordingly, even if Ochs were to be acquitted, I would nevertheless deny Dray's Motion for Judgment of Acquittal.

### VI

■ The remaining grounds asserted for the post-trial motions do not require extended discussion. They are largely themes and variations on contentions previously considered and do not persuade me to grant those motions.[18]

### VII

For the reasons set forth more fully above, the defendants' several post-trial motions are hereby DENIED.

### FINDINGS AND ORDERS UPON ENTRY OF JUDGMENT

In connection with the entry of Judgment in this matter, the Court makes the following findings.

A. Pursuant to 18 U.S.C. § 3143: having concluded (1) by clear and convincing evidence that the defendant Richard Dray is not likely to flee or pose a danger to the safety of other persons or the community if released pending appeal and (2) that, at least until resolution of *Bourjaily v. United States*, 781 F.2d 539 (6th Cir.1986), *cert.*

*granted*, —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 246 (1986), now *sub judice* in the Supreme Court, the appeal raises a substantial question of law likely to result in reversal or an order for new trial and the appeal is not for purpose of delay, it is hereby

ORDERED that the defendant, Richard Dray, shall be enlarged on bail pending appeal under the conditions of release previously entered in this matter.

B. Pursuant to 18 U.S.C. § 3580: after a consideration of (1) the loss to the victim, City of Boston, which I find by a fair preponderance of the evidence adduced at trial would not have been sustained but for the bribe made to the unindicted coconspirator, Robinson, and which I further find to be in the amount of $12,200; (2) the financial resources and earning ability of the defendant, Richard Dray, as disclosed in the presentence report; and (3) the needs of defendant Richard Dray and his dependents, as disclosed in the presentence report, it is hereby

ORDERED pursuant to 18 U.S.C. § 3579 that the defendant, Richard Dray make restitution in the amount and the manner set forth in the Judgment and Commitment Order.

### FINDINGS AND ORDERS UPON ENTRY OF JUDGMENT

In connection with the entry of Judgment in this matter, the Court makes the following findings.

A. Pursuant to 18 U.S.C. § 3143: having concluded (1) by clear and convincing evidence that the defendant Paul Ochs, Jr. is not likely to flee or pose a danger to the safety of other persons or the community if released pending appeal and (2) that, at least until resolution of *Bourjaily v. Unit-*

---

18. The defendant Ochs made a late filing of his Motion for a New Trial under Fed.R.Crim.P. 33. The law on timeliness in this area is rigorously austere. As the Second Circuit has stated in *United States v. Dukes*, 727 F.2d 34, 38 (2nd Cir.1984):

the Rule contains explicit time limits ... [A] motion on ... grounds [other than newly discovered evidence] must be made "within seven days after verdict or finding of guilty or within such further time as the Court may fix *during* the seven-day period." These time lim-

its are jurisdictional. If a motion is not timely filed, the District Court lacks power to consider it.

(citations omitted, emphasis added).

Lacking the power to grant the relief sought, I am obliged to deny the Defendant's Motion to File Late. As is apparent from my treatment of the merits of the issues in connection with other motions before me, however, the defendant Ochs' Rule 33 motion, even if timely filed, would have been denied.

*ed States*, 781 F.2d 539 (6th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 246 (1986); now *sub judice* in the Supreme Court, the appeal raises a substantial question of law likely to result in reversal or an order for new trial and the appeal is not for purpose of delay, it is hereby

ORDERED that the defendant, Paul Ochs, Jr. shall be enlarged on bail pending appeal under the conditions of release previously entered in this matter.

B. Pursuant to 18 U.S.C. § 3580: after consideration of (1) the loss to the victim, City of Boston, which I find by a fair preponderance of the evidence adduced at trial would not have been sustained but for the bribe made to the unindicted coconspirator, Robinson, and which I further find to be in the amount of $12,200; (2) the financial resources and earning ability of the defendant, Paul Ochs, Jr., as disclosed in the presentence report; and (3) the needs of defendant Paul Ochs, Jr. and his dependents, as disclosed in the presentence report, it is hereby

ORDERED pursuant to 18 U.S.C. § 3579 that the defendant, Paul Ochs, Jr. make restitution in the amount and the manner set forth in the Judgment and Commitment Order.