UNITED STATES of America, Appellee,

v.

Paul OCHS, Jr., Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Richard DRAY, Defendant, Appellant.

Nos. 87–1465, 87–1501.

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1988.

Decided March 15, 1988.

---

Earle C. Cooley with whom Thomas G. Guiney and Cooley, Manion, Moore & Jones, P.C., Boston, Mass., were on brief for defendant, appellant Paul Ochs, Jr.

William P. Homans, Jr., with whom Homans, Hamilton, Dahmen & Marshall, Boston, Mass., was on brief for defendant, appellant Richard Dray.

F. Dennis Saylor, IV, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, ALDRICH and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Paul Ochs, Jr. and Richard M. Dray were convicted in February 1987 of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341. According to the indictment, Ochs and Dray conspired during 1984 to obtain a building permit from the City of Boston for a fraudulently low fee by deliberately underestimating the cost of renovation at a commercial building in downtown Boston. The indictment charged that, to facilitate this scheme, Dray, an attorney, double billed the building owner for certain legal fees and then split the windfall with Ochs, the construction project manager, and with the city official who approved the building permit. At the government's request, the district court instructed the jury that Ochs and Dray could be convicted for conspiring to deprive the city of its intangible right to the honest and faithful services of its employee, even if no financial harm to the city were involved. On appeal, the principal argument advanced by Ochs and Dray is that this instruction was plainly erroneous under *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) —decided after the convictions in this case —and that their convictions must therefore be reversed. Although conceding that *McNally* applies to this case and that the instruction in question was erroneous under *McNally*, the government argues that

the convictions should be affirmed because the erroneous instruction was harmless surplusage. We reverse and remand for a new trial.

## I. BACKGROUND

The centerpiece of this case is the former S.S. Kresge Building (the building), a six-story structure located at the corner of Washington Street and Temple Place in downtown Boston. In early 1984, Berwind Realty Service, a Philadelphia-based company, purchased an option to buy the building from a group of investors including Ochs. Berwind established a Massachusetts limited partnership, Temple Place Associates (TPA), to develop the property and TPA purchased the property in February 1984. Ochs and another investor formed a corporation which was hired by TPA to oversee the construction on TPA's behalf. TPA also hired Mirabassi Associates (Mirabassi) as general construction manager. Mirabassi had earlier been retained by Ochs and his fellow investors to evaluate the structural soundness of the building.

In order to carry out the major renovation contemplated at the building, it was necessary to obtain a building permit from the city's Department of Inspectional Services. The fee for such a permit is based on the cost of construction and, when the relevant events involved here occurred in 1984, the permit rate was seven dollars per thousand for the first hundred thousand dollars of construction costs, and ten dollars per thousand thereafter. To facilitate this fee system, each application for a permit had to contain an estimated cost of construction, which was then reviewed by the department for reasonableness.

Three building permits for work at the building were obtained on behalf of TPA, only the last of which is the subject of the criminal charges in this case. The first two permits, of comparatively modest size, were for exploratory work at the building and for demolition prior to construction. Applications for those permits were prepared and filed by Edwin Walkey, an engineer at Mirabassi. Walkey also worked at preparing the application for the general construction permit, but was informed by Ochs that the filing of that application would be handled by Dray. Dray had previously been retained by TPA for his legal services. The eventual application prepared by Walkey contained an estimated construction cost of $2,425,000, which was based on the total anticipated cost of the project minus certain nonconstruction costs. Walkey had Ochs sign this application as TPA's representative and obtained a check from Mirabassi for $23,950, the appropriate building permit application fee for a $2,425,000 project. Walkey then contacted Dray to inform him that the application was ready to be filed.

Meanwhile, Dray was taking some steps of his own regarding TPA's building permit. According to Douglas Robinson, Boston's Chief Building Inspector at the time,[1] Dray met with Robinson some time in May of 1984 to discuss a building permit for the building. Dray told Robinson that the anticipated cost of construction was between two and two and one-half million dollars; Robinson responded "that that sounded like a high estimated cost just for interior demolition." Dray and Robinson then discussed "lowballing," or lowering the estimated cost of the project, and then splitting the amount that could be saved in permit fees. Dray reportedly told Robinson that, before finalizing such a deal, he would have to discuss the idea with a "neighbor" of his who was connected with the project. Dray's "neighbor" reference was apparently to Ochs, who, like Dray, resided in Milton, Massachusetts.

Consistent with his discussion with Robinson, Dray informed Walkey that the esti-

**1.** Robinson testified at trial under a grant of immunity. He had previously pleaded guilty to an indictment for perjury in connection with his testimony before a grand jury investigating corruption at the Department of Inspectional Services. In return for his plea and his cooperation in the ongoing investigation, the government agreed not to bring any further charges against Robinson. Since the agreement, Robinson has admitted that, as a city official, he occasionally received money from private parties in return for expediting permits and for approving deliberately underestimated costs.

mated cost in the application prepared by Walkey was too high. At Dray's direction, Walkey prepared a new application with an estimated cost of $1,200,000 and, as with the previous application, had Ochs sign it for TPA. Beyond the change in estimated cost, the amended application also contained an additional notation not found in the previous one: "Tenant improvements within building to be filed under separate application(s)." Walkey did not know how the $1,200,000 figure was calculated nor was he aware at the time of the language change. Dray also had Walkey return the $23,950 check to Mirabassi and have a new check for $11,750, the appropriate application fee for a $1,200,000 project, issued.

Armed with the new application and check, Dray returned to Robinson's office to procure Robinson's approval. According to Robinson, Dray announced that he had secured the cooperation of "this person"— again, presumably Ochs—and that "this person" would receive two-thirds of the savings while Dray and Robinson would split the remaining third. Robinson thereafter initialled the application, supplying the necessary approval, and Dray filed it. Robinson testified that, approximately one or two months later, he met with Dray at a lounge near City Hall and was handed an envelope containing $400–600. Robinson understood that he was eventually to receive more money, but, despite Dray's

promises, no additional payments were forthcoming.

For the services he rendered in helping to procure a building permit, Dray submitted two bills on the same day, May 29, 1984. A bill for $1,687.50, representing thirteen and one-half hours of work at $125 per hour, was submitted by Dray to Ochs, who forwarded it to TPA. Another bill for $5,975, representing an unspecified number of hours, was submitted to Mirabassi. Both bills were paid in full and the proceeds deposited into Dray's checking account.[2] The same day that Dray deposited the $5,975 check, July 3, 1984, he wrote a personal check to Ochs for $3,000. Ochs deposited that check into his own account. On July 9, 1984, approximately the date that Robinson recalls receiving his payment from Dray, Dray wrote himself a check for $600 and cashed it at a bank near City Hall.

On October 10, 1986, Ochs and Dray were indicted by a federal grand jury. The indictment alleged generally that the two had engaged in a scheme to lowball the estimated construction costs in applying for a building permit, double bill for Dray's services, and split the resulting illicit profits between themselves and Robinson. It contained six counts, one charging conspiracy to commit mail fraud[3] and five charging substantive mail fraud.[4] At trial, the district court directed verdicts for the defendants on three of the substantive counts and the jury acquitted on the two remain-

---

**2.** A third bill for $30,000, representing services between May 1984 and March 1985, was submitted to TPA on March 27, 1985. As with the bill to Mirabassi, the text accompanying the bill did not set forth the particular number of hours worked. The bill did describe a number of tasks undertaken by Dray, the majority of which was said to have occurred after the building permit episode. The bill also included, for the third time, "submission of application to Department for building permit."

**3.** The federal conspiracy statute, 18 U.S.C. § 371, provides in pertinent part:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

ing substantive counts.[5] Our review is thus limited to Count One, the conspiracy count.

In setting out the conspiracy count, paragraph fourteen of the indictment described three separate frauds. Ochs and Dray allegedly conspired to defraud:

(a) The City of Boston and its citizens of approximately $12,000 in additional permit fees which should have been paid the City in connection with the issuance of the building permit for the 477–481 Washington Street project;

(b) The City of Boston and its citizens of their right to have the affairs of the City conducted honestly, impartially, and free from corruption, fraud, and undue favoritism; and

(c) The firms of Mirabassi and Associates and Temple Place Associates who were double billed for the same purported legal services performed by DRAY in connection with his filing of the building permit application for the 477–481 Washington Street project.

The independent nature of the intangible rights fraud described in subparagraph (b) was emphasized in the district court's charge to the jury. The relevant instruction provided:

With respect to that portion of the scheme which alleges that the City of Boston and its citizens were defrauded of their right to the honest and faithful services of its employees, you do not have to find that the City actually lost money because of the scheme. It is sufficient if you find that the scheme did defraud or deprive the public of an intangible political or civil right, such as the right to honest government and to the honest and faithful services of government employees free from conflicting interests. Hence, if you find as a result of the scheme the public was deprived or defrauded of the right to the honest and faithful services of Douglas Robinson as an employee of the City's Inspectional Services Department, then it is irrelevant under this branch of the scheme alleged whether the City, in fact, lost any money as a result of the scheme to defraud.

On February 27, 1987, the jury found both Ochs and Dray guilty on Count One. Posttrial motions for acquittal were denied by the district court in an opinion dated May 5, 1987, 659 F.Supp. 1426. On May 11, Ochs and Dray were sentenced to respective prison terms of twelve and twenty-seven months. Both were also fined $6,100 and ordered to make restitution to the City of Boston in a like amount. On June 24, 1987, after notices of appeal had been filed in this case, the Supreme Court decided *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

## II. STANDARD OF REVIEW

The government and defendants agree that, in our direct review of the convictions entered below, we are bound by *McNally,* even though it was decided after the completion of proceedings in the district court. There can be no doubt that *McNally* applies.[6] "In disposing of cases before us it is our responsibility to make such disposition as justice may require. 'And in deter-

---

**5.** The directed verdicts were explicitly based on insufficient evidence of mailing, while the reason for the jury's acquittals is necessarily less clear. On appeal, the government, apparently conceding that its evidence of mailing was weak, ascribes that as the cause. Ochs and Dray, on the other hand, urge that the acquittals represent the jury's rejection of the government's double billing theory. Finding that this type of speculation is not relevant to the issues presented on appeal, we do not attempt to divine the reason for the jury's acquittals.

**6.** We note in passing that *McNally* has unleashed a wave of collateral attacks on old mail fraud convictions based on intangible rights instructions, which are now wending their way through the federal courts. In the collateral attack context, courts have had to wrestle with the issue of whether *McNally* should be applied retroactively to convictions which became final before *McNally,* and have reached divergent conclusions. *Compare United States v. Mandel,* 672 F.Supp. 864, 874–75 (D.Md.1987) (applying *McNally* retroactively) *and Ingber v. Enzor,* 664 F.Supp. 814, 822–24 (S.D.N.Y.1987) (same) *with United States v. Gill,* 673 F.Supp. 275, 279–82 (N.D.Ill.1987) (refusing section 2255 relief in light of *McNally* ) *and United States v. Callanan,* 671 F.Supp. 487 (E.D.Mich.1987) (refusing to apply *McNally* retroactively). Because this case involves a direct appeal rather than a collateral attack, retroactivity is not an issue.

mining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered.'" *Ashcraft v. Tennessee*, 322 U.S. 143, 156, 64 S.Ct. 921, 927, 88 L.Ed. 1192 (1944) (quoting *Patterson v. Alabama*, 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082 (1935)); *see United States v. Byers*, 740 F.2d 1104, 1115–16 n. 11 (D.C.Cir.1984); *Pendergrast v. United States*, 416 F.2d 776, 780–81 (D.C.Cir.), *cert. denied*, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969); *see also Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."); *Hamling v. United States*, 418 U.S. 87, 102, 94 S.Ct. 2887, 2889–90, 41 L.Ed.2d 590 (1974) ("Our prior decisions establish a general rule that a change in the law occurring after a relevant event in a case will be given effect while the case is on direct review."). The remaining question, over which the parties disagree, is the standard by which we should determine whether the district court's instruction constitutes reversible error.

▪ Although *McNally* casts doubt on only one of the three frauds alleged in the conspiracy count, the general rule is "that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983); *accord Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957); *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117

(1931); *United States v. Norton*, 808 F.2d 908, 911 (1st Cir.1987). An exception to this rule has emerged only in cases where uncertainty as to the ground upon which the jury relied can be eliminated. This can be done in two situations: where a verdict based on any ground would mean that the jury found every element necessary to support a conviction on the sufficient ground, *see, e.g., United States v. Jacobs*, 475 F.2d 270, 283–84 (2d Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973); or where extrinsic factors in the record make it clear that, although the jury could have relied on an insufficient ground, it did not, in fact, do so. *See, e.g., United States v. Alexander*, 748 F.2d 185, 189–90 (4th Cir. 1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985).

Not surprisingly, the government urges that this case falls within the *Jacobs/Alexander* exception. The government further asserts that in applying the exception, we are bound by the plain error standard of Federal Rule of Criminal Procedure 52(b) because no objection to the intangible rights instruction was made at trial. Ochs and Dray, on the other hand, assert that this case is governed by the general rule of *Zant v. Stephens*. Ochs and Dray urge that the harmless error beyond a reasonable doubt standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967), is the correct standard of review.

We recognize that there seems to exist a confusion in the federal courts over the proper standard to apply in a case such as this where a controlling Supreme Court precedent is handed down after conviction. Post-*McNally* courts have split on the issue. *Compare United States v. Richerson*, 833 F.2d 1147, 1157 (5th Cir.1987) (applying plain error standard) *with United States v. Doherty*, 675 F.Supp. 726, 732–36 (D.Mass.1987) (applying harmless error beyond a reasonable doubt standard).[7] But

---

7. The government and the defendants have also drawn our attention to the standard applied in *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974), where it was said: "in the unusual posture of this case, in which petitioners agree that the challenged instruction was proper at the time it was given by the District Court, but now seek to claim the benefit of a change in the law which casts doubt on the correctness of portions of it, we hold that reversal is required only where there is a probability that the [new jury instruction] would have

we do not think that a prolonged analysis of whether a plain error or harmless error standard applies here would be fruitful. Without deciding the point, we, like the Third Circuit in the recent case of *United States v. Piccolo*, "are satisfied that if ... the jury instructions allowed conviction for conduct outside the proscription of the mail fraud statute, such instructions would constitute both plain error and a defect affecting [Och's and Dray's] due process rights." 835 F.2d 517, 519 (3d Cir.1987).

## III. THE EFFECT OF McNALLY v. UNITED STATES

The Supreme Court's decision in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), has been variously described as "blockbusting," as "a total surprise" and as a "wholly unexpected explication of the law of mail fraud." *United States v. Piccolo*, 835 F.2d 517, 521 (3d Cir.1987) (Aldisert, J., dissenting) ("blockbusting"); *United States v. Slay*, 673 F.Supp. 336, 343 (E.D.Mo.1987) ("a total surprise"); *United States v. Doherty*, 675 F.Supp. 726, 728 (D.Mass.1987) ("wholly unexpected explication of the law of mail fraud"). It was, without a doubt, a departure from the law of every court of appeals—including this one—to consider the issue of intangible rights mail fraud prosecutions. *See, e.g., United States v. Silvano*, 812 F.2d 754 (1st Cir.1987); *McNally*, 107 S.Ct. at 2882–83 & ns. 1–3 (Steven, J., dissenting) (collecting cases). *McNally* has thus called into question numerous jury instructions delivered in accordance with the prior governing law. This is one such case.

The alleged fraud in *McNally* was a scheme run by three individuals active in Democratic Party politics in Kentucky during the 1970's: Gray, Hunt, and McNally. Gray was a member of the then Democratic governor's cabinet and Hunt was state Democratic Party chairman. Through his party position, Hunt maintained *de facto* control over the selection of insurance companies from which the state purchased its policies. Hunt arranged a deal with an insurance company whereby, in return for being selected as an agent for securing a workmen's compensation policy, the company agreed to share commissions with entities identified by Hunt. One such entity was Seton Investments, Inc., a company set up by Hunt, Gray and McNally solely for collecting commissions. Over four years, some $200,000 in commissions was paid by the insurance company to Seton. Additional commissions were paid to a second agency, and then passed on to McNally.

On account of this scheme, Hunt was charged with and plead guilty to tax and mail fraud. Gray and McNally, petitioners before the Supreme Court, were criminally indicted for mail fraud and conspiracy to commit mail and tax fraud. As Justice White described it, the mail fraud count of the indictment

alleged that petitioners had devised a scheme (1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and (2) to obtain, directly and indirectly, money and other things of value by means of false pretenses and the concealment of material facts. The conspiracy count alleged that petitioners had (1) conspired to violate the mail fraud statute through the scheme just described and (2) conspired to defraud the United States by obstructing the collection of federal taxes.

After informing the jury of the charges in the indictment, the District Court instructed that the scheme to defraud the citizens of Kentucky and to obtain money by false or fraudulent pretenses and concealment could be made out by either of two sets of findings: (1) that Hunt had *de facto* control over the award of the workmen's compensation insurance contract ...; that he directed payments of commissions from this con-

materially affected the deliberations of the jury." *Hamling*, however, is not controlling here because the instruction in this case was not "proper" at the time it was given. Although sanctioned by numerous courts of appeals, intangible rights instructions have never been approved by the Supreme Court and, indeed, the gist of *McNally* is that the mail fraud statute does not and never has extended to violations of purely intangible political or civil rights.

tract to Seton, an entity in which he had an ownership interest, without disclosing that interest to persons in state government whose actions or deliberations could have been affected by the disclosure; and that petitioners, or either of them, aided and abetted Hunt in that scheme; or (2) that Gray, in either of his appointed positions, had supervisory authority regarding the Commonwealth's workmen's compensation insurance at a time when Seton received commissions; that Gray had an ownership interest in Seton and did not disclose that interest to persons in state government whose actions or deliberations could have been affected by that disclosure; and that McNally aided and abetted Gray (the latter finding going only to McNally's guilt).

107 S.Ct. at 2878–79 (footnotes omitted).

Gray and McNally were convicted on both counts and their convictions affirmed by the United States Court of Appeals for the Sixth Circuit. *United States v. Gray*, 790 F.2d 1290 (6th Cir.1986). The Sixth Circuit relied on the long line of court of appeals cases holding that public officials owe a fiduciary duty to the public and that misuse of their office (through concealing material facts) for private gain is a fraud proscribed by the federal mail fraud statute. *Gray*, 790 F.2d at 1295 (citing *United States v. Mandel*, 591 F.2d 1347, 1364 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980)); *McNally*, 107 S.Ct. at 2879. Under these cases, individuals without a formal public office may also be held to be public fiduciaries if they have a special relationship to the government and in fact make governmental decisions. *Gray*, 790 F.2d at 1296 (citing *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)); *McNally*, 107 S.Ct. at 2879. Hunt was such a fiduciary, the court of appeals said, because of his control over the awarding of insurance contracts. 790 F.2d at 1296.

The Supreme Court reversed, holding in essence that the mail fraud statute was intended to protect property rights but not "the intangible right of the citizenry to good government." 107 S.Ct. at 2879. Relying on the scant legislative history of section 1341 and early cases interpreting it, the Court held that Congress's purpose in enacting the section was to safeguard property interests. Thus, said the Court, the statute's reference to schemes "to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" should not be read disjunctively, as the courts of appeals had done; rather, the word "defraud" itself also refers to "wronging one in his property rights." *Id.* at 2880–81 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). Because the charge in *McNally* did not require the jury to find that the Commonwealth of Kentucky was defrauded of or suffered a loss to any of its money or property interests, the Court held that the convictions must be reversed.

Five months after *McNally*, the Supreme Court clarified its *McNally* holding in *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Although confirming that the mail fraud statute pertains to property interests and not intangible political or civil rights, the *Carpenter* Court gave a broad reading to protected property interests by affirming the convictions of individuals who misappropriated confidential news information from the *Wall Street Journal*. As Justice White wrote for the Court:

Here, the object of the scheme was to take the Journal's confidential business information—the publication schedule and contents of the "Heard [On The Street]" column—and its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

108 S.Ct. at 320.

Given the state of the law before *McNally*, it was common practice for prosecutors to request and receive intangible rights instructions in mail fraud cases, even where there was an alleged loss of proper-

ty. In a number of recent post-*McNally* cases, in which individuals convicted pursuant to such instructions had their convictions on direct appeal at the time *McNally* was decided, the courts of appeals have confronted the question—also posed by this case—of whether improper intangible rights instructions so polluted the jury's deliberations as to render the conviction invalid after *McNally*. Some courts have upheld the convictions: *United States v. Piccolo*, 835 F.2d 517 (3d Cir.1987); *United States v. Richerson*, 833 F.2d 1147 (5th Cir.1987); *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987); *United States v. Wellman*, 830 F.2d 1453 (7th Cir.1987); *United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). Others have reversed in light of *McNally: United States v. Gordon*, 836 F.2d 1312 (11th Cir. 1988); *United States v. Covino*, 837 F.2d 65 (2d Cir.1988); *United States v. Murphy*, 836 F.2d 248 (6th Cir.1988); *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987); *United States v. Herron*, 825 F.2d 50 (5th Cir.1987). Consistent with *McNally*, the guiding principle behind these cases has generally been that convictions must be reversed unless the jury was required to base its conviction on conduct proscribed by the mail fraud statute, and not just on a violation of intangible rights. *See, e.g., United States v. Cooke*, 833 F.2d 109 (7th Cir.1987) (affirming convictions on counts which required a finding of loss to property, but reversing convictions on counts based on intangible rights violations).

Some of the cases affirming mail fraud convictions after *McNally* have thus been relatively straightforward applications of *McNally*, involving situations where, despite some intangible rights language in the jury instructions, the jury was in fact explicitly required to find that the fraudulent scheme was also intended to cause monetary harm. *See, e.g., Piccolo*, 835 F.2d at 520 (jury charge required finding that defendant devised scheme "to defraud [certain companies] of money"); *Wellman*, 830 F.2d at 1463 (jury required to find that defendant devised scheme "to defraud another of something of value"). In other cases, however, courts have stretched to find more ingenious theories of property loss which purportedly satisfy *McNally*, and then affirmed on the basis of these theories even though they were not put before the jury. In *Runnels*, for instance, the Sixth Circuit affirmed the mail fraud conviction of a union official who, in return for a monthly fee, referred worker's compensation cases to a particular attorney. 833 F.2d at 1184–85. The jury in *Runnels* was instructed that the official could be found guilty of mail fraud if he defrauded union members of their intangible right to fair and honest union representation. Nevertheless, relying primarily on the theory set forth in a footnote in Justice Stevens's dissent in *McNally*, the court held that the conviction could stand even after *McNally*. It said that, in order to convict, the jury must have found that a bribe was paid and, under established law, such a payment to a fiduciary properly belongs to the principal. 833 F.2d at 1186–92; *see McNally*, 107 S.Ct. at 2890–91 n. 10 (Stevens, J., dissenting). The official's failure to turn over the bribe to the union, therefore, was a property deprivation satisfying *McNally*.

In *Richerson*, the Fifth Circuit went even farther. Relying explicitly on Justice Stevens's dissent, the court held that whenever an employee conceals material information from his employer, he causes a property harm to his employer because the employer does not receive the services for which he paid. 833 F.2d at 1157 (quoting *McNally*, 107 S.Ct. at 2890 n. 10 (Stevens, J., dissenting)). The *Richerson* court thus affirmed the convictions of employees who concealed an illicit deal from their employer, even though the jury had been given an intangible rights instruction and not told it was necessary to find any property loss. 833 F.2d at 1156–58. *See also Fagan*, 821 F.2d at 1010–11 n. 6 (affirming mail fraud conviction on the basis of Justice Stevens's dissent where the jury charge was not before the court).

Relying heavily upon *Runnels, Richerson* and *Fagan*, the government in this case urges that Ochs's and Dray's convic-

tions be affirmed under a similar theory of property loss. The government suggests the following framework for analyzing this case. Even if the jury wanted to convict Ochs and Dray under an intangible rights theory, the jury must have believed at least one of the theories of wrongdoing put forth by the government: (1) the lowballing of construction cost estimates, (2) the double billing for legal services, or (3) the payment of a bribe to Robinson.[8] Under any of these theories, there is a deprivation of property satisfying *McNally*. In the case of lowballing, the City of Boston was deprived of construction permit fees. In the case of double billing, TPA was overcharged for legal services. The theory of the city's loss from the bribe is a replay of *Runnels;* Robinson was a city employee and therefore his bribe money properly belonged to, but was not paid to, the city. The government, therefore, argues that, no matter what evidence it relied upon, the jury must have found a property deprivation in order to convict and, under the *Jacobs/Alexander* exception already discussed, the convictions should stand.

 Although superficially attractive, our analysis requires that this argument be rejected. In the first place, the government's attempt to favorably reconstruct the jury deliberations on appeal is completely refuted by the actual jury charge it requested and received. Paralleling paragraph fourteen of the indictment, which charged a violation of intangible rights as a separate and independent theory of liability, Government's Requested Instruction No. 8 reads:

SCHEME NEED NOT FINANCIALLY HARM THE CITY OF BOSTON

With respect to that portion of the scheme which alleges that the City of

Boston and its citizens were defrauded of their right to the honest and faithful services of its employees, *you do not have to find that the City actually lost money* because of the scheme. It is sufficient if you find that the scheme did deprive or defraud the public of an intangible political or civil right such as he [sic] right to honest government and to the honest and faithful services of government employees. Hence, if you find that, as a result of the scheme, the public was deprived or defrauded of the right to the honest and faithful services of Douglas Robinson, as an employee of the City's Inspectional Services Department, then *it is irrelevant whether the City lost any money as a result of the scheme to defraud.*

(Emphasis added).

In argument before the district court, defense counsel objected strenuously to this instruction on the ground that the alleged intangible rights violation should not be viewed as a separate and independently sufficient charge:

I suggest that there's no way one can view this case as having two elements standing separate and apart. Depriving the citizens of the City of Boston of the honest and faithful services of an employee, to wit Douglas Robinson, cannot occur if the jury find [sic], if the jury finds that Mr. Robinson was not paid off.[9]

But the court disagreed. Describing intangible rights as a "separate branch" of the alleged fraud involving benefits "not capable of quantification," the district court said:

[L]et's assume that the jury finds and agrees with your theory, which is that [the construction permit application fee]

---

8. The government contends that, if the jury believed none of these theories, there was no evidence left on which to base a guilty verdict. Because we reject the government's argument on other grounds, we do not address this latter contention.

9. In its brief and at oral argument, the government quoted this and other similar statements by defense counsel. The government's point in doing so was to attempt to show that defendants

actually concur in its current claim that the alleged violation of intangible rights was not a separate charge in this case, but was simply part of a single overarching theory focusing on monetary loss. However, in view of the fact that the district court overruled this objection and, indeed, formulated a charge almost identical to the one requested by the government, we fail to see how these comments work in the government's favor.

was a fair fee and that Walkey and the Mirabassi group really weren't sophisticated enough to know that a million two would be a fair fee. The City of Boston is not defrauded of $12,000, but it is defrauded of the faithful services of its employee when monies are given to that employee in the fashion that they are given here. It's a violation of, minimally a violation of conflict of interest.

In a final effort to persuade the court, defense counsel characterized the government's strategy as an attempt

> to put a little more space between the dominoes so that when the first one falls, the next one doesn't fall with it. And I suggest that that is inappropriate ... in effect, by giving an instruction such as this, the Court would say that even if I'm able to convince the jury that, A, there was no low-balling, and/or B, there was no payoff, that nonetheless there's some ethereal concept out there such as depriving the City of Boston of faithful service, apart from those concepts, that would permit conviction here. That isn't what the indictment says.... [The fraud] is alleged to have been done a certain way and I object strenuously to the separating of those ways. They are tied together. And if you take one of them out, they all collapse. And the Government is asking the Court to take one or more of them out and leave the third one standing by itself. And I don't think that it is a fair approach to the case, both from the point of view of what is alleged and from the point of view of what has been proved.

The district court rejected this argument and delivered Requested Instruction No. 8 virtually verbatim. Thus, despite the government's ingenious arguments on appeal, we are left in this case with an intangible rights jury instruction expressly stating that financial harm is "irrelevant." It is difficult to conceive of an instruction more at odds with *McNally.* We recognize the general validity of the policy underlying the *Jacobs/Alexander* exception invoked by the government: upholding a conviction based on a sufficient charge that was clearly found by the jury even though

a related insufficient charge was also put before them. But the government has cited no case—and we have found none— where the exception has been applied in an extreme case like this where the trial court explicitly instructed the jury that it *was proper* to rely *solely* on the invalid theory of criminal liability.

When the government requested the intangible rights instruction in this case, it must have believed that the jury could convict for a violation of intangible rights alone—otherwise the instruction is meaningless and absurd. Likewise, when the district court delivered the instruction, it must also have envisioned that a conviction could be properly returned even if no financial harm were involved. The colloquy between the court and defense counsel quoted above reinforces this. The effect of the instruction, which repeated twice the idea it was not necessary to find harm, was twofold: the jury was told that the central element of mail fraud identified in *McNally* was irrelevant, and the jury was told that it *was possible*, on the evidence before them, to convict even if there was no financial harm. Under these circumstances, we are unwilling to engage in speculation about whether, despite the instruction, the jury actually found some financial harm. Even if the government is right that, as a logical matter, the jury *should* have found some form of financial harm in order to convict, we believe that the court's instruction— saying exactly the contrary—would have so confused the jury's deliberations on the financial harm issue as to render the conviction invalid.

A second fatal flaw in the government's argument is its reliance on the "secret profits" theory suggested in Justice Stevens's *McNally* dissent, and subsequently adopted by Fifth and Sixth Circuits in *Fagan*, *Runnels* and *Richerson*. With due respect to those courts, we believe that such an expansive view of property protected by the mail fraud statute is irreconcilable with the basic holding of *McNally.* Like this case, *McNally* involved a scheme by *public officials* to obtain an illicit profit in connection with performing official

duties. *See McNally,* 107 S.Ct. at 2881 ("For purposes of this action, we assume that Hunt, as well as Gray, was a state officer."). As Justice White framed it,

> [t]he issue is thus whether a state officer violates the mail fraud statute if he chooses an insurance agent to provide insurance for the State but specifies that the agent must share its commissions with other named insurance agencies, in one of which the officer has an ownership interest and hence profits when his agency receives part of the commissions.

*Id.* at 2881–82. The Court's answer was a resounding "no." With the issue squarely before it, the Court held that the mere fact a fiduciary profits from a breach of duty is not a sufficient property deprivation to satisfy the requirements of the mail fraud statute if the profit was not, directly or indirectly, at the principal's expense. Thus, although we are aware of the established rule that a principal *may* institute a lawsuit to claim the illicit profits of an agent or fiduciary, *see Runnels,* 833 F.2d at 1186–88; Restatement (Second) of Agency § 403 (1958), we cannot ignore the holding of the Supreme Court that such an abstract property loss is not enough to support a conviction. *See McNally,* 107 S.Ct. at 2882 ("Hunt and Gray received part of the [insurance] commissions but those commissions were not the commonwealth's money.").[10]

*Carpenter v. United States,* —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), is not to the contrary. *Carpenter* holds that certain forms of intangible property, like confidential news information or trade secrets, are protected by the mail fraud statute. But *Carpenter* does not extend the mail fraud statute to every breach of fiduciary duty simply because such a breach might give rise to a state law cause of action by the principal against the fiduciary. *See id.* at 320 (describing the right to

"honest and faithful service" as "an interest too ethereal in itself to fall within the protection of the mail fraud statute"). *Carpenter* involved theft from the *Wall Street Journal* of news information, a commodity which is the newspaper's stock-in-trade. No one has alleged, and we do not believe it accurate to suggest, that bribe money paid to city officials plays the same role in the City of Boston.

In *Runnels,* the Sixth Circuit tried to distinguish *McNally* on the ground that the insurance premium in *McNally* "would have been paid to some agency" even without the alleged fraud, 107 S.Ct. at 2881, and so the commissions paid to Hunt and Gray were *not* state money. *Runnels,* 833 F.2d at 1192. The court's analysis is confused. Whether premium money ceases to be the state's once it is paid out is not the point of the secret profits cases on which *Runnels* relies. Rather, the point is that, when a fiduciary *receives* money in violation of a duty, the money *becomes* the state's. *See Runnels,* 833 F.2d at 1192 ("Even though Runnels argues that [attorney's] fees would have been paid in any event, the bribes would not have been."). In *McNally, Runnels* and this case, a fiduciary *did* receive money in violation of a duty owed to his principal. Yet in *McNally,* in contrast to *Runnels,* the Court held that receipt of such money is *not* a cognizable loss for purposes of the mail fraud statute.

*Richerson* and *Fagan* place primary emphasis on a footnote in Justice Stevens's *McNally* dissent, with which, says the Fifth Circuit, the *McNally* majority did not disagree. *Richerson,* 833 F.2d at 1157 & n. 25; *Fagan,* 821 F.2d at 1010–11 n. 6. We believe the contrary, that if Justice Stevens's views were shared by the majority of the Court, his would have been a majority opinion and not a dissent. Not a single

---

**10.** This aspect of *McNally* is further supported by two post-*McNally* cases considered by the Court. *See Holzer v. United States,* 108 S.Ct. 53, 98 L.Ed.2d 18 (1987); *McMahan v. United States,* —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987). Both *Holzer* and *McMahan* involved fiduciaries who accepted illicit payments in violation of their duties and who were convicted of

mail fraud under an intangible rights theory. *See United States v. Holzer,* 816 F.2d 304 (7th Cir.), *vacated,* —— U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987); *United States v. Price,* 788 F.2d 234 (4th Cir.1986), *vacated sub nom. McMahan v. United States,* —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987). In each case, the Supreme Court vacated in light of *McNally.*

other Justice was willing to join the portion of Justice Stevens's dissent on which *Richerson* and *Fagan* rely. Moreover, the majority did effectively reject Justice Stevens's analysis in a footnote, which stated that, although "Justice Stevens would affirm the convictions" on the basis that "shar[ing] commissions violated state law," "we should assume that it did not." 107 S.Ct. at 2882 n. 9. Justice Stevens noted only that the duty of a fiduciary to deliver secret profits to his principal *"may* fulfill the Court's money or property requirement." 107 S.Ct. at 2890 n. 10 (Stevens, J., dissenting) (emphasis added).

We understand that the intangible rights doctrine has become firmly entrenched in the federal courts and that old habits die hard. But we do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front. Ochs's and Dray's convictions are reversed.[11]

## IV. ADDITIONAL ERRORS CLAIMED BY DEFENDANTS

■ Seeking to avoid retrial, Ochs and Dray raise a number of additional points, none of which merits lengthy discussion. First, Dray, but not Ochs, says that the indictment should be dismissed. Dray's argument is that, after *McNally*, the intangible rights portion of the Count One conspiracy charge is invalid and, therefore, the indictment fails to charge an offense. We disagree. To be sure, the subparagraph of Count One pertaining to a violation of the city's intangible rights does not charge an offense after *McNally*. The government concedes as much. But that does not render the entire indictment invalid. "[An] indictment is sufficient if the offense is described with sufficient clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense." *United States v. Fusaro,* 708 F.2d 17, 23 (1st Cir.) (citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974)), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). In addition to the intangible rights violation, Count One charges Ochs and Dray with conspiracy to commit mail fraud by lowballing the construction cost estimates on the building permit and by double billing for legal services. Those independent charges both involve property deprivations and thus survive *McNally*.

In *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court explicitly rejected the contention that it is improper to convict on charges that are narrower than, but included in, the scheme charged in the indictment. Said the Court,

> Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent from the allegations of the offense proved may normally be treated as a "useless averment" that "may be ignored."

*Id.* at 136, 105 S.Ct. at 1815 (quoting *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927)). In this case, if we ignore the separate [12] ill-fated

11. Even if, through judicial interpretation, the secret profits theory could be made consistent with the substantive holding of *McNally*, it would not warrant a different result here, because that was not the theory of criminal liability put to the jury. The government in *McNally* also asserted on appeal that, despite the jury instruction, the defendants had in fact "obtained property by means of false representations." 107 S.Ct. at 2882. But, said the Court, "there was nothing in the jury charge that required such a finding. We hold, therefore, that the jury instruction permitted a conviction for con-

duct not within the reach of § 1341." *Id; see also Runnels,* 833 F.2d at 1194–95 (Guy, J., dissenting) (arguing that the court should not affirm on the basis of a legal theory not raised at trial). In view of our preceding discussion of the jury charge in this case, a similar result is mandated here.

12. Ironically, were we to accept the government's substantive argument, outlined above, that the intangible rights violation was *not* separate from the other alleged schemes, we could not so easily conclude that the indictment sur-

intangible rights allegations, we are left with a conspiracy count still properly alleging two schemes to defraud in violation of section 1341. The count adequately provides notice to Ochs and Dray concerning the nature of the charges and is also sufficient to allow them to plead it in the future as a bar to subsequent prosecutions. *See id.* at 135, 105 S.Ct. at 1815. Assuming that the improper subparagraph is stricken, we see no defect in the indictment such that Ochs and Dray cannot be retried and, if the jury so decides, convicted. *See United States v. Slay,* 673 F.Supp. 336, 349–51 (E.D.Mo.1987) (setting aside guilty verdicts in light of *McNally* but upholding indictment that continued to charge a valid mail fraud offense; granting a new trial).

A second claimed trial defect relates to Robinson's testimony about Dray's out-of-court statements—statements which pointed to Ochs's involvement in the scheme. The question is whether these statements were properly admitted by the district court under the coconspirator exception to the hearsay rule. *See* Fed.R.Evid. 801(d)(2)(E). At oral argument, Ochs's attorney conceded that the statements had been properly admitted under *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), but continued to press the argument that there was insufficient evidence to support Ochs's conspiracy conviction. Since Dray still contests the admissibility point, we must address it in any event.

Dray does not challenge the admission of the disputed statements against him; rather, he says that the statements were improperly admitted against Ochs and that, without the statements, there was insufficient evidence to convict Ochs. Further, Dray claims that there is insufficient evidence that Robinson was a member of the conspiracy because he did not have the requisite criminal intent to use the mails in

furtherance of the scheme to defraud. If Ochs and Robinson are eliminated as coconspirators, Dray argues that he, too, is entitled to a judgment of acquittal because there is no one left with whom he could have conspired. *See United States v. Morales,* 677 F.2d 1, 3 (1st Cir.1982) ("a conspiracy conviction of one defendant will not be upheld when all other alleged coconspirators are acquitted"). We find that the disputed statements were properly admitted and that there was sufficient evidence against Ochs. We thus reject Dray's claim without addressing his argument relating to the evidence against Robinson.

■ The same evidentiary arguments now before us were also raised by the defendants in pre- and post-trial motions. They were exhaustively analyzed in an excellent opinion by the district court. *See United States v. Dray,* 659 F.Supp. 1426 (D.Mass.1987) (Memorandum Regarding Post–Trial Motions). At the time the district court acted, the Supreme Court's decision in *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), had not yet been handed down and the court lacked a definitive rule on the evidentiary standards for the admission of coconspirator hearsay statements. Nevertheless, presciently anticipating the holding of *Bourjaily,* the court examined both the hearsay and nonhearsay evidence tending to establish that Ochs was a member of the conspiracy. Standing alone, the court said, the independent nonhearsay evidence [13] did not establish by a preponderance that Ochs was a coconspirator. But, when "[r]efracted by the light shed on it by" Dray's hearsay statements testified to by Robinson, the district court found that "Ochs' actions take on full color as the efforts of a conspirator seeking to further the ends of the conspiracy." *Dray,* at 1437. The court thus admitted the hearsay statements under Rule 801(d)(2)(E). The correctness of

vives *McNally* under the test set out in *Miller. See Miller,* 471 U.S. at 136, 105 S.Ct. at 1815 ("part of indictment unnecessary to *and independent from* the allegations of the offense proved" may be treated as harmless surplusage) (emphasis added).

13. Three principle pieces of nonhearsay evidence were offered by the government on this issue: (1) the difference in estimated costs on the two permit applications, (2) Ochs's presentation of Dray's two bills for legal services, and (3) the receipt by Ochs of a $3,000 check from Dray.

the court's analysis was confirmed in *Bourjaily*, where the Court explicitly held for the first time that courts may properly consider potentially inadmissible hearsay in determining whether a conspiracy has been established for purposes of Rule 801(d)(2)(E). 107 S.Ct. at 2779–83.

The admission of Robinson's testimony was correct. We find no basis for the defendants' assertions that the district court relied *solely* on inadmissible hearsay in making its Rule 801(d)(2)(E) determination, a practice the propriety of which was left unresolved in *Bourjaily*. *See id.* at 2781–82. We also find no error in the district court's conclusion that the hearsay and nonhearsay evidence combined established a conspiracy under the preponderance standard. *See United States v. Reynolds*, 828 F.2d 46, 47 (1st Cir.1987) (district court's determination of preponderance under Rule 801(d)(2)(E) must be upheld unless clearly erroneous).

 Having said that, we have no trouble concluding that the sum of the evidence in this case was sufficient to support the jury's finding that Ochs was a coconspirator. The jury had before it not only the incriminating statements by Dray, but the confirming circumstantial evidence of the permit application revision and the $3,000 payment to Ochs. Thus, although we reverse the convictions of Ochs and Dray on *McNally* grounds, we reject their contention that they deserved a judgment of acquittal on all counts.

Before trial, Ochs and Dray moved *in limine* to exclude certain evidence on the ground that the government's bill of particulars was not particular enough. The motion was denied and, on appeal, Ochs and Dray raise the issue of whether this was reversible error. Because the issue has not been briefed by the defendants and because the case must be remanded for a new trial in any event, we will not address the argument at this time. Likewise, the claimed errors in sentencing are moot in light of our reversing the convictions and will not be addressed.

*The judgments of conviction entered by the district court are vacated and the case is remanded for a new trial.*